### IN THE UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF ARKANSAS
### NORTHERN DIVISION

IN RE:  WILLIAM SLOAN DURHAM AND       Case No. 3:19-bk-15221J
      DINA GAIL DURHAM,                         (Chapter 7)

**Debtors.**

**AGHERITAGE FARM CREDIT SERVICES, PCA**           **PLAINTIFF**

**VS.**           **AP No. 3:20-ap-01028**

**WILLIAM SLOAN DURHAM AND**
**DINA GAIL DURHAM**           **DEFENDANTS**

### <u>MEMORANDUM OPINION</u>

In this adversary proceeding, AgHeritage Farm Credit Services, PCA ("**AgHeritage**") alleges that William Sloan Durham ("**Mr. Durham**") and Dina Gail Durham ("**Dina Durham**") (collectively, the "**Durhams**") provided false financial information to AgHeritage to induce it to extend loans to the Durhams; sold collateral without the consent or knowledge of AgHeritage; diverted the sale proceeds of collateral to their own use; and failed to keep or preserve financial information from which their business transactions can be determined.  As a result of these alleged actions, AgHeritage seeks to have the debt owed to it by the Durhams declared nondischargeable under 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), and (a)(6).  It also objects to the Durhams' discharge under 11 U.S.C. § 727(a)(2) and (a)(3).  The Durhams deny that any of the relief sought should be granted.

A trial was held in Jonesboro, Arkansas, on September 9, 2021.  Ralph W. Waddell of the firm Waddell, Cole & Jones, PLLC, appeared on behalf of AgHeritage.  Two representatives of AgHeritage, Alan Brannon and Gary Grosdidier, appeared and testified on its behalf.  G. Mike

DeLoache of the DeLoache Law Office appeared on behalf of the Durhams. The Durhams appeared in person and testified on their own behalf. After the trial, the Court took the matter under advisement.

For the reasons stated below, the Court finds that judgment should be entered in favor of the Durhams on all counts.

## I. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J). The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## II. Facts

### A. General Background

Mr. Durham began ranching at a young age and has managed farm operations most of his life. His operations have included both row crop farming and livestock operations. Mr. Durham's parents, two brothers, and his son are also engaged in farming operations. Dina Durham, Mr. Durham's wife, testified that she has never participated in the daily farming operations.

The Durhams maintained a bank account at the Bank of Cave City. It was a joint account for several years and at some point not clear from the record the account was changed to Mr. Durham's name only. The Durhams used the account at the Bank of Cave City for everything: the row crop operation, the cattle operation, and for household expenses. Dina Durham wrote checks on the account, including some for living expenses and personal expenses.

For many years AgHeritage financed the Durhams' row crop and livestock operations. Alan Brannon, an Agricultural Lending Officer with AgHeritage, was the loan officer for several of the Durhams' loans.  He testified that he has known the Durhams his entire life and was familiar with Mr. Durham's farming and cattle operations.

Mr. Durham explained that he suffered significant losses in his row crop operation in 2011 and subsequent years.  In 2011, the crop was destroyed by hail damage.  The damage was not covered by Mr. Durham's catastrophic insurance policy.  Then, in two subsequent years, floods destroyed between twenty and thirty percent of his soybean crop.  Mr. Durham testified that the damages resulting from the hail and floods exceeded $500,000.00.

Mr. Durham discontinued his row crop farming operation at the end of 2015.  Mr. Durham testified this decision was "not by choice," but AgHeritage refused to renew his crop loan for 2016.  (Tr. at 69, 128).  The reason for AgHeritage's decision not to renew the loan is unclear from the record.

Mr. Durham's livestock operation was a cow/calf operation where cows are bred with bulls and the calves are sold to generate income.  Mr. Durham handled his cattle operation personally, raising the cattle from birth and even naming some of them.  He testified that he did not experience the same losses in his cattle operation as he did in farming.

Sometime prior to February 2016, Mr. Brannon approached Mr. Durham and said, "Your cash flow looks good.  All your numbers [are] good.  We need more collateral."  (Tr. at 128). This conversation was followed by the initiation of what was referred to as the "bullet loan." Mr. Brannon explained that a bullet loan is "like a declining balance operating loan or a balloon note" used to "restructure [a customer's] debt or to do a workout."  (Tr. at 48).  The loan usually has a one-year maturity and allows the customer time to sell assets and pay down debt.

3

In the case of the Durhams, AgHeritage did not anticipate future business with the Durhams and entered into a bullet loan as a workout arrangement in 2016 (the "**Bullet Loan**"). The Bullet Loan administratively consolidated several of the Durhams' existing loans with AgHeritage into one loan. Following this consolidation, four loans remained between the Durhams and AgHeritage: the Bullet Loan (Loan No. 2700), an operating loan (that AgHeritage had frozen) (Loan No. 5500), an equipment refinance loan (Loan No. 9900), and a real estate refinance loan (Loan No. 2900).[1]

### B. Bullet Loan

#### (1) February 2016 Balance Sheet and Inspection Report

The Bullet Loan process began in February 2016. The Durhams signed a loan application related to the loan restructuring agreement with AgHeritage. (Pl.'s Ex. 1, at #001).[2] In connection with this loan application, Mr. Durham also signed a balance sheet dated February 4, 2016 (the "**February 2016 Balance Sheet**"). (Pl.'s Ex. 1, at #002). Dina Durham did not sign this balance sheet. The February 2016 Balance Sheet included a certification that the information was "a true, correct and complete statement" of Mr. Durham's "financial condition as of the date shown." (Pl.'s Ex. 1, at #002). The balance sheet reflected $4,600,033.00 in total assets and $3,570,561.00 in total liabilities for a total equity of $1,029,472.00.

The loan schedule on the February 2016 Balance Sheet reflected nine outstanding loans with AgHeritage, one loan with the Bank of Cave City, and one third-party owner financed loan.

---

[1] Only the last four digits of the loan numbers are given.

[2] AgHeritage introduced sixty-five exhibits in a tabbed exhibit notebook numbering all the pages of the exhibits sequentially with Bates stamp numbers beginning with PCA #001 and running through PCA #423. During the trial the parties referred to separate pages of the exhibits by referencing the Bates stamp numbers. The Court will do the same in this memorandum opinion.

The AgHeritage loans had been made for various purposes including operating expenses, grain inventory, cattle purchases, equipment, and real estate purchases. The principal balance on the nine AgHeritage loans totaled $3,179,644.00. The loan with the Bank of Cave City was for the purchase of thirty head of cattle and was listed with a principal balance of $30,114.00. The third-party owner financed loan was for the purchase of 160 acres of real property and was listed with a principal balance of $197,746.00.

The asset portion of the February 2016 Balance Sheet reflected, among other things, 312 larger calves[3] valued at $1,100.00 a head for a total value of $343,200.00; 350 smaller calves valued at $750.00 a head for a total value of $262,500.00; 20 bulls valued at $2,500.00 a head for a total value of $50,000.00; and 450 "momma cows"[4] valued at $1,750.00 a head for a total value of $787,500.00. The values given reflected the market values as of the balance sheet date. A later sale price for the cattle may not equal the balance sheet amount. At trial, counsel for AgHeritage asked Mr. Durham on direct examination, "AgHeritage relied on [the February 2016 Balance Sheet], didn't it?" (Tr. at 87). Mr. Durham responded, "Yes." (Tr. at 87).

In accordance with AgHeritage's procedures, the information for the number of cattle on this and future balance sheets came from AgHeritage's inspection reports. Both Mr. Durham and Mr. Brannon testified about how the inspections were conducted. Mr. Brannon testified that he and Mr. Durham would drive to the different farms to count heads of cattle; the cattle were usually separated by type such as Angus and Charolais. Mr. Durham also grouped a certain number of momma cows with each bull, and they would count these groups in the various fields.

---

[3] The documents reflected two weight classes of calves: larger calves weighing approximately 750 pounds each and smaller calves weighing approximately 350 pounds each.

[4] At the hearing, the parties referred to the female breeding cows as "momma cows." For clarity and consistency, the Court will do the same.

Mr. Brannon testified that he and Mr. Durham would be in the truck for "quite a while going from farm to farm." (Tr. at 54).

When asked if it was correct that "you pull up to a field with a few hundred black cows in there, you're—you're trying to count every head that's there," Mr. Brannon stated that was correct. (Tr. at 49). He acknowledged that "[i]t's hard to count," adding he was not "going to say [he] counted every head, but [he] . . . got a number from [Mr. Durham], or the hired hand, and that's what [he] used." (Tr. at 48–49).

Mr. Durham testified that he kept records of the number of cattle in a notebook, and he would give those numbers to Mr. Brannon during the inspections. He testified he would tell Mr. Brannon those were the numbers "more or less, because . . . [he would] have a few to die." (Tr. at 122). As an example of the types of records maintained by Mr. Durham and his family, Mr. Durham introduced a handwritten "cow count" prepared by his hired hand. (Defs.' Ex. 11). The record included the number, type, and location of the cattle and was typical of the records kept on the farm for the cattle operation.

The livestock numbers on the February 2016 Balance Sheet were derived from an inspection conducted on February 4, 2016, by Mr. Brannon with Mr. Durham present. Mr. Brannon prepared an inspection report following the inspection (the "**February 2016 Inspection Report**"). (Pl.'s Ex. 2). The numbers on the February 2016 Balance Sheet are consistent with the numbers on the February 2016 Inspection Report. Mr. Brannon noted on the February 2016 Inspection Report that "[a]ll cattle are in good health." (Pl.'s Ex. 2, at #015). Mr. Durham testified that he trusted Mr. Brannon and signed the February 2016 Balance Sheet based on this trust. At trial, however, Mr. Durham testified that he did not agree with the number of cattle listed on the February 2016 Balance Sheet. This testimony was inconsistent with

6

Mr. Durham's deposition testimony in November 2019 that he did not "dispute the head counts that are either in the 2016 balance sheet or the 2017 balance sheet." (Tr. at 81).

In explaining his basis for disputing the livestock numbers at the time of trial, Mr. Durham testified that the numbers were "throw[n] at [him]" on the day of the deposition and after having had time to reflect, he disagreed with the numbers. (Tr. at 82). He testified he was using about 1,300 acres of land for the cattle operation, which, given the nature and location of the land, would support momma cows "somewhere in the 300 range," not 450. (Tr. at 124). Mr. Durham explained that only a certain number of cows could be supported by areas of his farming operation. Generally, he could raise a momma cow and her calf with two to two-and-one-half acres of land, but in the "bottom ground" areas it would take four to eight acres of land to maintain a cow and her calf. This testimony was consistent with Mr. Brannon's testimony. He owns a few head of cattle himself and agreed it generally takes two-and-one-half acres of land to maintain a momma cow and her calf, but added it depends on the location and how much grass can be grown there. Mr. Brannon did testify that Mr. Durham's cattle appeared overcrowded at times, depending on the weather and the quantity of grass available.

### *(2) Signing of Bullet Loan*

It was not until May 11, 2016, that the Durhams executed the promissory note in favor of AgHeritage in connection with the Bullet Loan. (Pl.'s Ex. 3). The note was in the principal amount of $1,746,850.00 and matured on May 1, 2017 (the "**Note**"). During the one-year term of the loan, Mr. Durham was to sell cattle, equipment, and real estate to pay down the debt.

The Durhams granted AgHeritage a security interest in all livestock and equipment to secure repayment of the Note. (Pl.'s Ex. 6). AgHeritage also held a security interest in all proceeds of its collateral. The security agreement included a provision prohibiting the sale or

other disposition of the collateral except as specifically authorized in writing by AgHeritage.

The Durhams also warranted in the security agreement that they were the owners of the collateral

and the collateral was free of all interests, liens, and security interests except AgHeritage's

security interest and security interests disclosed by the Durhams to AgHeritage in writing.  The

collateral was described in general terms in an exhibit to the security agreement, but no list of the

items was attached.

### (3) First Extension of Bullet Loan - May 2017 Balance Sheet and Inspection Report

At the time the Bullet Loan matured, May 1, 2017, the Durhams still had collateral to

liquidate and the loans were not paid in full.  AgHeritage agreed to extend the maturity date of

the Bullet Loan to July 1, 2017, with the understanding that the Durhams would continue to

liquidate assets to pay the debt.  The Durhams signed an undated "Memo of Understanding"

acknowledging that the maturity date of the Bullet Loan was being extended to July 1, 2017 (the

"**First Extension**").  (Pl.'s Ex. 15).  This "Memo of Understanding" was described by

Mr. Durham as a "workout plan to get this debt paid."  (Tr. at 89).  Under the plan, the Durhams

agreed to refinance certain collateral and sell other collateral, including cattle.

On May 22, 2017, shortly after the loan was extended to July 1, 2017, AgHeritage made

another inspection of Mr. Durham's cattle and Mr. Durham signed another balance sheet (the

"**May 2017 Balance Sheet**") (Pl.'s Ex. 11).  The May 2017 Balance Sheet contained a

certification that the information "is a true, correct and complete statement" of Mr. Durham's

"financial condition as of the date shown."  (Pl.'s Ex. 11, at #063).

The loan schedule on the May 2017 Balance Sheet reflected the four remaining loans

with AgHeritage, including the Bullet Loan.  It also reflected the third-party owner financed loan

reflected on the February 2016 Balance Sheet.  The loan with the Bank of Cave City was not

reflected on the May 2017 Balance Sheet.  Mr. Durham testified that he paid this loan in full during the initial term of the Bullet Loan, between the time of the February 2016 Balance Sheet and the May 2017 Balance Sheet.

The asset portion of the May 2017 Balance Sheet reflected, among other things, 165 larger calves valued at $1,000.00 per head for a total value of $165,000.00; 185 smaller calves valued at $650.00 per head for a total value of $120,250.00; 21 bulls valued at $2,500.00 per head for a total value of $52,500.00; and 323 momma cows valued at $1,500.00 per head for a total value of $484,500.00.  Mr. Durham testified that he did not dispute the numbers on the May 2017 Balance Sheet.

As with the prior balance sheet, the cattle information on the May 2017 Balance Sheet came from Mr. Brannon's inspection of the collateral.  The inspection report prepared by Mr. Brannon was introduced by AgHeritage (the "**May 2017 Inspection Report**").  (Pl.'s Ex. 12). In the report, Mr. Brannon stated, "Cattle were viewed by [Brannon] (with owner present).  All cattle are in good health."  (Pl.'s Ex. 12, at #072).  Although Mr. Durham did not recall being with Mr. Brannon that particular day, he trusted Mr. Brannon's representation that he was there.

The May 2017 Inspection Report reflected 165 larger calves; 21 bulls; and 323 momma cows, consistent with the May 2017 Balance Sheet.  The May 2017 Inspection Report contained a discrepancy, however, regarding the number of smaller calves.  In one column, it listed 350 smaller calves.  In another column on the same row, it reflected 185 smaller calves.  In calculating the value of the smaller calves, Mr. Brannon used the 185 figure and multiplied 185 by $650.00, resulting in a value of $120,250.00 for the smaller calves.  The 185 figure and value calculation were rolled over to the May 2017 Balance Sheet.

At trial, Mr. Brannon testified on direct examination that Mr. Durham had 350 smaller calves at the time of the May 2017 inspection.  Later, however, when asked by the Court whether the 350 figure or 185 figure was correct, Mr. Brannon testified that 185 was the correct number because "[t]hat's what transformed [sic] to the balance sheet."  (Tr. at 61).  No further explanation was given for the discrepancy in the two numbers.

### (4) Second Extension of Bullet Loan

The Durhams were unable to meet all the requirements of the First Extension and on August 3, 2017, a second extension was approved, extending the maturity date of the Bullet Loan to November 1, 2017 (the "**Second Extension**").  (Pl.'s Ex. 16).  The Durhams signed another "Memo of Understanding" agreeing to sell or refinance certain collateral in order to pay the debt owed to AgHeritage.

### (5) July 2018 Inspection Report

The next inspection of the cattle did not occur until July 25, 2018, fourteen months after the May 2017 inspection.  At the July 2018 inspection, Mr. Brannon received a list of cattle from one of Mr. Durham's employees known as "Caveman."  Caveman prepared the list at Mr. Durham's request because Mr. Durham was working at another job and was unable to attend the inspection.  Mr. Durham testified that Caveman took care of the cattle daily and was very familiar with the herd.  As with the prior inspections, Mr. Brannon prepared an inspection report (the "**July 2018 Inspection Report**").  (Pl.'s Ex. 13).  Caveman's "cow count," showing the number, type, and location of cattle, was attached to the July 2018 Inspection Report.  The July 2018 Inspection Report reflected 160 larger calves, 106 smaller calves, 17 bulls, and 319 momma cows.  There is not a balance sheet associated with this inspection.

In the July 2018 Inspection Report Mr. Brannon noted: "All cattle appeared to look healthy with a few showing signs of aging which is normal in any cattle herd. However over the last couple years customer has not spent the time he once did working and vaccinating cattle due to cost and lack of funds." (Pl.'s Ex.13, at #075).

Mr. Durham explained that once the Bullet Loan was in place in 2016, he was allowed to pay operating expenses from his operating expense account for only one year. After that year, Mr. Durham was "on [his] own to provide for [the cattle]." (Tr. at 131). Expenses incurred in a cattle operation include hay, fuel, fertilizer for the pastures, and veterinary supplies. Mr. Durham worked an outside job in order to cover the expenses of the cattle operation. He kept the cows fed and cared for, out of his own pocket, until they were all sold.

### *(6) October 2018 Inspection Report*

Mr. Brannon inspected Mr. Durham's cattle again on October 3, 2018, with Mr. Durham present. Mr. Brannon prepared an inspection report, which was introduced by AgHeritage (the "**October 2018 Inspection Report**"). (Pl.'s Ex. 14). This inspection report reflected 71 total calves and 253 momma cows. Mr. Brannon's note in the October 2018 Inspection Report stated:

> All cattle appeared to look healthy with a few showing signs of aging which is normal in any cattle herd. . . . Cattle numbers were given to [Brannon] by customer and is [sic] showing 66 momma cows short of the list that was given [AgHeritage] back on 7-25-2018. Customer explained to [Brannon] that 20 of cows on the prior list was [sic] actually his mom's cows that he had been taking care of and that [Caveman] shouldn't have had those on the list. He also said that he had 24 cows and 2 bulls stolen by one of his ex hired hands and was awaiting trial to see outcome. Since las [sic] list customer has sold 165 calves, 8 cows, and a bull at sale in West Planes [sic] and turned funds into [AgHeritage]. However it is our understanding that customer had sold some calves a couple months ago at sale and [Bank of Cave City] had their names in [sic] check and the funds either got turned into them or customer kept funds to operate on. Since prior chattel appraisal [AgHeritage] is down 66 head on momma cows, 7 head of bulls, and approximately 30-40 head of calves. Values have also dropped due to dry weather and lack of hay in the surrounding area.

11

(Pl.'s Ex. 14, at #081).  Mr. Brannon testified that Mr. Durham's mother, brother, and son all have land near Mr. Durham's cattle operation, so it was possible some of the cattle on Caveman's list did belong to Mr. Durham's mother.

At the time of the October 2018 Inspection Report, the Bullet Loan had matured and the loan remained in a workout mode.  At the request of AgHeritage, a third party named Rick Foster estimated the value of Mr. Durham's remaining cattle.  Mr. Foster was a well-known buyer in the area.  Based on Mr. Foster's valuation, the remaining cattle were sold to Jack Dalton and Courtney Durham.  Jack Dalton tendered a check payable to Mr. Durham and AgHeritage in the amount of $114,000.00 on October 19, 2018.  (Pl.'s Ex. 33).  Courtney Durham, the Durhams' son, tendered a check payable to Mr. Durham and AgHeritage in the amount of $52,000.00 on October 26, 2018.  (Pl.'s Ex. 34).  No evidence was introduced as to the number of head of cattle Mr. Dalton or Courtney Durham purchased.  After the sales of cattle to Mr. Dalton and Courtney Durham, Mr. Durham had no remaining cattle.

The evidence at trial revealed that sometime during the workout process, Mr. Durham gave AgHeritage two tracts of land that had not previously been pledged for any of the AgHeritage loans.  He said he did this to show his "good faith" intentions to pay the debt.  (Tr. at 133).  Mr. Durham testified that he received nothing in exchange for providing this additional collateral to AgHeritage.  His testimony was uncontroverted.  One tract of land was completely unencumbered.  Mr. Durham testified he gave AgHeritage the deed to that piece of property, and the property sold for $180,000.00, which was paid to AgHeritage.  The second tract of land contained 160 acres.  Mr. Durham was buying this second tract on an owner-financed contract and had paid about half the contract price.  AgHeritage advanced enough money for the land sale

12

contract to be paid in full, and Mr. Durham gave the entire 160-acre tract of land to AgHeritage to sell and apply to his debt.

### C. Reductions in Cattle

#### (1) Theft of Cattle

As stated above, Mr. Brannon's notes in the October 2018 Inspection Report mentioned theft of some of Mr. Durham's cattle. Mr. Durham testified that some of his cattle had been stolen by Josh Reed, a former hired hand. An incident report was introduced concerning the theft of cattle from Mr. Durham's herd. (Pl.'s Ex. 50). Zach Barton with the Lawrence County Sheriff's Office prepared the report. According to the report, cattle were stolen from both Mr. Durham and a man named Ray Stone, who "had cattle at the same farm." (Pl.'s Ex. 50, at #300). According to the incident report, "28 cows, 1 bull, and 30 calves" were taken from Mr. Durham and Mr. Stone. (Pl.'s Ex. 50, at #303). In addition, at least one cow or bull belonging to Mr. Durham was believed to have been sold in Josh Reed's name at the Ash Flat sale barn.

The narrative in the incident report describes sales of cattle by Josh Reed to Doug Yasier and an attempted sale of cattle by Josh Reed to Ricky Foster. There were four sales to Mr. Yasier between March 14, 2018, and March 25, 2018.[5] According to the report, Mr. Yasier had receipts reflecting purchases of 7 cows and 21 calves. Fourteen of the calves could be "positively identified" as Mr. Durham's cattle and were returned to Mr. Durham's farm. (Pl.'s Ex. 50, at #304). Mr. Stone viewed the rest of the cattle on Mr. Yasier's farm but determined none of the cattle belonged to him.

---

[5] The report indicates the last sale to Yasier was on "05-25-2018." In reviewing the report as a whole and in context, however, it appears likely the last sale was on March 25, not May 25. This conclusion is supported in part by the fact that the narrative at issue was dated April 19, 2018.

13

It was not until March 30, 2018, that Mr. Reed attempted to sell cattle to Ricky Foster. According to the incident report, about ten days prior to the attempted sale, Mr. Foster had learned from a person at the West Plains[6] sale barn that someone was interested in selling "a large amount of cattle." (Pl.'s Ex. 50, at #302). Mr. Foster was given Josh Reed's contact information and they agreed to meet. Mr. Foster viewed the cattle consisting of "several cows and a couple [calves]" in Smithville, Arkansas, and when he arrived, Mr. Foster knew the property was not owned by Mr. Reed. (Pl.'s Ex. 50, at #302). Mr. Foster attempted to "stall," and Mr. Reed left without completing the sale to Mr. Foster. (Pl.'s Ex. 50, at #302).

During direct examination of Mr. Durham, AgHeritage's counsel stated that the report seemed to indicate that only 28 cows were stolen and 14 were returned to Mr. Durham resulting in a net loss of only 14 cows. Mr. Durham disagreed and stated that those numbers reflected only the documented sales from Josh Reed to Mr. Yasier. He explained that Josh Reed could have sold cattle to other purchasers. Mr. Durham's testimony is consistent with the incident report in that it was not until after the four sales to Mr. Yasier that Josh Reed attempted to sell "several cows and a couple [calves]" to Mr. Foster. (Pl.'s Ex. 50, at #302).

Mr. Durham also introduced into evidence an undated restitution form in which he listed 28 cows, 28 calves, and 1 bull as stolen for a total loss of $70,700.00. (Defs.' Ex. 10).

### *(2) Death of Cattle*

Although AgHeritage's inspection reports did not account for any loss of cattle due to death, Mr. Brannon testified that on a yearly basis there is always death within a herd, which could explain some of the decrease in Mr. Durham's cattle numbers. The mortality rate for cattle was discussed by both of AgHeritage's representatives and by Mr. Durham. Mr. Brannon

---

[6] This sale barn was also referred to as Ozarks Regional Stockyard.

testified the annual mortality rate for cattle is generally 5% to 10%. This percentage applies to all classes of cattle, cows and calves alike. Another representative of AgHeritage, Gary Grosdidier,[7] testified that the rate could be "a number of different values," but he agreed that 5% to 10% "could be realistic." (Tr. at 183). Mr. Durham agreed with Mr. Brannon's annual mortality rate of 5% to 10%.

In addition to the natural mortality rate expected in a cattle operation, Mr. Durham testified that in the Fall of 2017 or 2018 he lost 30 to 35 head of cattle due to a blood disease known as anaplasmosis. This is a disease that attacks the red blood cells causing anemia and results in death of the cow within two to three days. He further testified the mortality rate was "[v]ery high in the later years." (Tr. at 124). He testified that he had older cows, including cows above the average life span for each breed, which resulted in higher death rates during the winding-down of his cattle operation. When asked if he had any records to support disease and death of the cattle, Mr. Durham testified that at one time he had taken pictures of some of the dead cattle, but he deleted them so they would not be visible on his phone when sharing other pictures. He admitted that he had not raised the issue of dead cattle during the inspections with Mr. Brannon, and that he had not provided documentation to AgHeritage concerning the death of any of the cattle.

### (3) Cattle Sales

Mr. Durham testified that he typically sold his cattle to Ozarks Regional Stockyard ("**Ozarks Regional**"), Ash Flat Livestock Auction ("**Ash Flat Livestock**"), or Rick Foster.

---

[7] Mr. Grosdidier is vice president of FCS Financial, which provides services to AgHeritage. Those services include administration of AgHeritage loans that involve financial challenges such as litigation, bankruptcy, and foreclosure. He testified the Durhams' loans with AgHeritage were within his portfolio and he was familiar with them.

Ozarks Regional.  AgHeritage introduced seller history reports reflecting Mr. Durham's sales to Ozarks Regional in 2017 and 2018.  (Pl.'s Ex. 30).  The report reflected the following sale transactions for 2017:

| Sale Date | Gross Check | Net Check | # Head | Total Weight |
|---|---|---|---|---|
| 1/17/2017 | 25,901.02 | 25,162.53 | 30 | 20,395 |
| 2/21/2017 | 15,680.10 | 15,022.85 | 20 | 12,100 |
| 2/28/2017 | 12,952.55 | 12,366.30 | 16 | 9,825 |
| 4/18/2017 | 75,910.71 | 73,813.21 | 92 | 49,355 |
| 10/24/2017 | 18,860.25 | 18,165.50 | 22 | 12,840 |
| Totals | $149,304.63 | $144,530.39 | 180 | 104,515 |

(Pl.'s Ex. 30, at #128).

The report reflected the following sale transactions for 2018:

| Sale Date | Gross Check | Net Check | # Head | Total Weight |
|---|---|---|---|---|
| 1/5/2018 | 69,285.22 | 67,341.01 | 72 | 46,905 |
| 3/6/2018 | 19,612.40 | 18,926.83 | 22 | 11,830 |
| 6/26/2018 | 14,307.85 | 13,652.11 | 20 | 9,980 |
| 9/11/2018 | 67,074.54 | 65,236.76 | 92 | 46,610 |
| 9/12/2018 | 598.50 | 578.88 | 1 | 1,050 |
| 9/18/2018 | 55,322.12 | 53,920.27 | 73 | 35,545 |
| Totals | $226,200.63 | $219,655.86 | 280 | 151,920 |

(Pl.'s Ex. 30, at #134; Pl.'s Ex. 31, at #139).

The net proceeds from the above sales were paid by checks made payable to Mr. Durham and Bank of Cave City, with the exception of the three checks issued in September 2018 that included AgHeritage as a payee.

Ash Flat Livestock. AgHeritage also introduced seller history records reflecting Mr. Durham's sales to Ash Flat Livestock in 2018. (Pl.'s Ex. 32). The report reflected two sales in 2018. One was the sale of two calves on April 6, 2018, with a gross sale price of $1,342.15 and net sale proceeds of $1,293.73. The second was the sale of three calves on May 25, 2018, with a gross sale price of $2,385.65 and net sale proceeds of $2,301.26. Checks for the net sale proceeds were made payable to Mr. Durham and Bank of Cave City.

Rick Foster. Mr. Durham testified that he sold cattle to Rick Foster for several years. He met Mr. Foster around 2010. Mr. Foster was a buyer at Ozarks Regional, but he preferred to buy cattle directly to save commissions and expenses of hauling. Mr. Foster would pay a premium of approximately $25.00 per head to buy directly from the seller, and the entire community did business with him.

Mr. Durham testified that in March 2016 he sold cattle to Rick Foster and received $100,000.00 in exchange for the cattle. Mr. Durham testified that he deposited the $100,000.00 check into his account at the Bank of Cave City and then wrote a check to AgHeritage for the $100,000.00 to be applied to his loan.

As will be discussed more below, AgHeritage sent year-end account statements to the Durhams reflecting loan account activity for the previous year. In reviewing the 2016 year-end statement at trial, Mr. Durham testified that the $100,000.00 payment from the sale of cattle to Mr. Foster was not applied to a cattle loan but rather was applied to his grain inventory loan as a "special principal payment" on March 17, 2016, although it was from the sale of cattle. (Tr. at

118).  After reviewing a copy of the $100,000.00 check at trial, Mr. Grosdidier testified that

check reflected the sale of 112 calves.

### D.  9760 John Deere Combine

AgHeritage also introduced evidence concerning a 9760 John Deere Combine with Serial

No. H09760S707049 (the "**9760 JD Combine**").  AgHeritage argued that the Durhams

represented to AgHeritage that they owned the 9760 JD Combine and granted it a security

interest in the combine.  They alleged that unbeknownst to them, however, the combine was

owned by the Durhams' son, Courtney Durham, and financed with the Bank of Cave City as

evidenced by a security agreement dated November 1, 2013.  (Pl.'s Ex. 44).

The Durhams did execute a security agreement granting AgHeritage a security interest in

all their equipment at the time of the Bullet Loan.  The security agreement refers to "[a]ll

equipment" as collateral but does not contain a list of the items of equipment owned by the

Durhams.  (Pl.'s Ex. 6, at #046).  The 9760 JD Combine was not listed separately on any of

AgHeritage's UCC financing statements introduced into evidence.  The February 2016 Balance

Sheet reflected machinery and equipment with a total value of $672,00.00.  There is no itemized

list of machinery and equipment attached to the balance sheet.  There is, however, an itemized

list of machinery and equipment in the February 2016 Inspection Report.  The 9760 JD Combine

is not listed.  The value of all machinery and equipment reflected on the inspection report totaled

$672,000.00, consistent with the amount listed on the corresponding balance sheet.  None of the

other inspection reports introduced into evidence contained an itemized list of equipment.

As evidence of the Durhams' alleged wrongdoing, AgHeritage introduced an insurance

summary from Nationwide Insurance with the effective dates of May 21, 2017 through May 21,

2018, for Policy No. 6655660853 ("**Policy 853**").  (Pl.'s Ex. 39).  The equipment listed on

Schedule A of the insurance summary included the 9760 JD Combine.  Mr. Durham was listed as the "Named Insured."  However, there was an additional notation under his name stating, "See Named Insured Schedule."  (Pl.'s Ex. 39, at #164).  The "Additional Named Insured Schedule" listed both Dina Durham and Courtney Durham as additional named insureds.  (Pl.'s Ex. 39, at #165).  AgHeritage was listed as a loss payee on the Additional Interest Schedule.

AgHeritage also introduced a letter to AgHeritage from Nationwide Agribusiness Insurance concerning Policy 853.  (Pl.'s Ex. 40).  The letter indicated that AgHeritage's interest in the 9760 JD Combine had "been deleted" as of February 23, 2018.  (Pl.'s Ex. 40, at #183). However, AgHeritage also introduced a document titled, "Evidence of Property Insurance" dated April 5, 2018, referencing Policy 853, which showed the 9760 JD Combine as a covered item. (Pl.'s Ex. 41, at #186).   Mr. Durham is again listed as the "Named Insured" with the notation under his name "See Named Insured Schedule."  (Pl.'s Ex. 41, at #186).  The Named Insured Schedule was not part of the exhibit.

AgHeritage also introduced a document titled, "Evidence of Property Insurance" dated October 3, 2018, referencing Policy 853, which also included the 9760 JD Combine as a covered item.  (Pl.'s Ex. 42, at #189).   "Durham Farms, Sloan &/or Dina Durham" are listed as the insureds.  (Pl.'s Ex. 42, at #189).  AgHeritage is listed as a loss payee.

### E.  DeWitt Auction

As part of the workout agreement with AgHeritage, Mr. Durham agreed to sell his remaining equipment.  An auction was scheduled with the DeWitt Auction Company, Inc. ("**DeWitt Auction**").  Mr. Grosdidier testified that DeWitt Auction arranged for the auction to be held at the Durhams' property.  All equipment was to be "gathered up and then sold at that public auction."  (Tr. at 154).  AgHeritage introduced into evidence an appraisal list prepared by

DeWitt Auction dated November 8, 2018, listing equipment for auction.  (Pl.'s Ex. 35, at #156).
Several items of equipment are listed, including the 9760 JD Combine.

The auction was held about a year after the date on the appraisal list on December 13,
2019.  The 9760 JD Combine was sold at the auction for $23,690.00.  After the auction, Mr.
Durham advised DeWitt Auction that the sale proceeds for the combine were to be paid to his
son, Courtney Durham.  He testified that he had advised DeWitt Auction prior to the auction that
the combine belonged to Courtney Durham, but he had not advised AgHeritage of this because
he was not aware that it was on AgHeritage's list of collateral.

Mr. Grosdidier testified that he did not learn that Courtney Durham claimed ownership of
the 9760 JD Combine until after the auction.  He further testified that AgHeritage had relied on
the Durhams' ownership of the 9760 JD Combine at the time of the auction "because it was on
the insurance declaration page, it was on the value assigned with the balance sheets, [and] it was
on the depreciation schedules."  (Tr. at 156).  After investigating the purchase of the 9760 JD
Combine, AgHeritage discovered it was owned by Courtney Durham and financed by the Bank
of Cave City.  Based on the investigation, AgHeritage released its claim to the auction proceeds.
The remaining auction net sale proceeds of $201,823.00 were paid to AgHeritage.

**F.  Real Estate Sales**

During the workout process, Mr. Durham sold various tracts of real property with the
consent of AgHeritage.  Mr. Durham testified that he would find a buyer and notify AgHeritage.
AgHeritage would then approve the sale and release its mortgage interest in the property.
AgHeritage introduced nine partial mortgage releases filed between September 20, 2017 and
February 14, 2019.  (Pl.'s Exs. 18–19, 22–26, 28–29).  The details of the real estate sold and the
amount of the proceeds for specific tracts of real estate are not ascertainable from the record.

The only proposed sale Mr. Durham presented to AgHeritage that it did not approve was the sale of a 143-acre farm. Mr. Durham testified this was his best-producing farm, and he had a buyer willing to pay $4,000.00 per acre. AgHeritage did not approve the sale, believing the property could be sold for $4,500.00 an acre. Eventually, AgHeritage foreclosed on the property, and it was sold at a foreclosure sale for $3,500.00 per acre, bringing approximately $70,000.00 less than the original offer. AgHeritage received a check in the amount of $508,507.01 from the sale, consisting of the purchase price plus accrued interest.

### G. AgHeritage Records

#### (1) Year-End Account Statements

As stated above, after the Bullet Loan consolidated most of the Durhams' existing loans, four loans remained: the Bullet Loan (Loan No. 2700), an operating loan ("**Loan No. 5500**") (that AgHeritage had frozen), an equipment refinance loan ("**Loan No. 9900**"), and a real estate refinance loan ("**Loan No. 2900**"). Mr. Brannon testified that AgHeritage provided its customers with year-end account statements reflecting all transactions within a given year for the loan accounts. "[A]nything that happened with that account should be in that statement," according to Mr. Brannon. (Tr. at 57). This would include all payments on the loans, whether from the sale of livestock or otherwise. Mr. Grosdidier likewise agreed that the year-end statements would "reflect the transactions in each of the loan accounts during that calendar year." (Tr. at 163). Mr. Grosdidier further testified that there is documentation to show the source of all the payments reflected in the year-end statements. Mr. Durham testified that he does not believe AgHeritage gave him credit for all the payments made on his loans.

Mr. Durham testified that most of the checks from the sale of cattle were deposited into his account at the Bank of Cave City. He would then write a check from that account to

AgHeritage.  This was his method for keeping up with payments for tax purposes.  On occasion, he would deliver checks directly to AgHeritage without depositing them in his Bank of Cave City account.

Partial year-end statements for the years 2016 through 2020 were introduced into evidence by AgHeritage.  The incomplete statements make it difficult to determine the exact amount of advances, accrued interest, and payments made on the four loans during the periods covered.[8]  For 2016, only page three of the seven-page statement was introduced.  (Pl.'s Ex. 51).  AgHeritage apparently introduced this page to show the initial transactions for the Bullet Loan.  The other three loans remaining after the Bullet Loan consolidation are not reflected on the partial statement, but the partial statement does contain information about two older loans that were paid off during 2016 (Loan Nos. 5400 and 7500).  The statement shows ending balances of $0.00 for these two older loans.

The first two pages of the four-page 2017 year-end statement were introduced.  All four loans are reflected on the two pages, but the summary for Loan No. 2900 is incomplete because it was continued to page three, which was not introduced.  (Pl.'s Ex. 52).  From the information provided, it appears to the Court that balances existed on all four loans at the end of 2017.  However, despite testimony that all transactions for the loans should appear on the year-end statements, only the Bullet Loan is reflected on the 2018, 2019, and 2020 year-end statements.  (Pl.'s Exs. 53–55).  Mr. Grosdidier testified that the balance on the 2020 year-end statement owed on the Bullet Loan was the balance owing, plus additional interest and attorney fees, to AgHeritage at the time of trial.  It is unclear from the record exactly when the other three loans

---

[8] It was apparent to the Court that AgHeritage did not intend to introduce complete copies of the year-end account statements into the record.  Counsel for AgHeritage stated, "our exhibits just relate to the loan that's in litigation.  I mean, there may be another loan on it, but it's because it was copied on the same statement."  (Tr. at 117).

were paid off. Mr. Grosdidier testified the other three loans were paid from the sale of real estate or government crop payments, but he "did not see any cattle checks for those loans." (Tr. at 188). The backup information supporting payments on the other three loans was not included in the record. From the record, the Court can determine the following facts regarding the four loans.

Loan No. 5500, the frozen operating loan, had a beginning balance of $100,386.63 on January 1, 2017, which included $97,593.00 in principal and $2,793.63 in interest. During 2017, AgHeritage applied $11,343.63 in payments to principal and interest. The source of the payments is not provided in the record. An additional $6,476.96 was added to the loan in advances and accrued interest. The ending balance on December 31, 2017, was $95,519.96. Although a summary of the transactions for Loan No. 5500 was not reflected on the 2018 year-end statement, some of the back-up information for the Bullet Loan (Loan No. 2700) also reflected allocations of payments for Loan No. 5500. From this information, it appears that $97,637.45 was applied to Loan No. 5500 from real estate sale proceeds in 2018.

Loan No. 9900, the equipment refinance loan, had a beginning balance of $299,427.12 on January 1, 2017, which included $290,431.35 in principal and $8,995.77 in interest. During 2017, AgHeritage applied $20,246.07 in payments to interest. The source of the payments is not provided in the record. An additional $15,731.55 was added to the loan in interest. A principal payment of $37,151.57 is shown as applied twice and reversed twice. It is not possible from the evidence to determine the true nature of these transactions. The ending balance on December 31, 2017, was $294,912.60. Although a summary of the transactions for Loan No. 9900 was not reflected on the 2018 year-end statement, some of the back-up information for the Bullet Loan (Loan No. 2700) also reflected allocations of payments for Loan No. 9900. From this

information, it appears that $301,793.42 was applied to Loan No. 9900 from real estate sale proceeds in 2018.

Loan No. 2900, the real estate refinance loan, is listed on the 2017 year-end statement beginning on page two but continues on page three, which was not introduced into evidence. From the information available, it can be determined that Loan No. 2900 had a beginning balance of $749,426.42, which included $724,200.08 in principal and $25,226.34 in interest. The incomplete summary reflects an interest payment in the amount of $38,171.44, but the total interest paid for the year was $55,569.73. Although the balance of the loan was reduced to $527,738.08 by December 31, 2017, no evidence was introduced from which the Court can determine the source of the $261,162.05 in principal and interest payments made during 2017. Although a summary of the transactions for Loan No. 2900 was not reflected on the 2018 year-end statement, some of the back-up information for the Bullet Loan (Loan No. 2700) also reflected allocations of payments for Loan No. 2900. From this information, it appears that $520,857.45 was applied to Loan No. 2900 from real estate sale proceeds in 2018. The amount of additional advances or interest added to Loan No. 2900, if any, and the source of the remaining payments made on Loan No. 2900 cannot be determined from the evidence.

The year-end statements do include a summary of the transactions for the Bullet Loan (Loan No. 2700) from 2016 through 2020. AgHeritage applied $188,562.88 in payments to the Bullet Loan in 2016. The back-up information for the payments indicates that substantially all the payments were related to Mr. Durham's crop operations.

In 2017, AgHeritage applied $157,977.41 in payments to the Bullet Loan. The back-up information for the payments indicates that $24,931.35 in payments were related to Mr. Durham's crop operations. No evidence was introduced from which the source of the remaining

$133,046.06 in payments can be determined.  The Court notes, however, that the payment made on May 1, 2017, in the amount of $73,588.41, was made only thirteen days after Mr. Durham sold cattle at Ozarks Regional and received net sale proceeds of $73,813.21.  The proximity of this payment to the sale of cattle suggests the source of this payment was likely cattle proceeds.

In 2018, AgHeritage applied $448,859.42 in payments to the Bullet Loan.  Of this amount, at least $336,235.91 appears to the Court to be from the sale of cattle and $112,618.51 appears to be from the sale of real estate.[9]  The payments included a $42,000.00 payment drawn from Mr. Durham's personal bank account at the Bank of Cave City with the notation "calves" dated February 7, 2018.

The 2019 year-end statement reflects special principal payments totaling $11,074.69.  No back-up information is provided to show the source of the payments.  The 2020 year-end statement reflects special principal payments totaling $715,824.36, including $201,823.00 applied to the loan on January 6, 2020, from DeWitt Auction and $508,507.01 from the Lawrence County Clerk for the sale of real property at foreclosure.  The Court is unable to determine the source of the remaining payments.

Mr. Grosdidier testified that he reviewed the account statements for the years 2016 through 2020 and could locate only six checks that he could identify as being from the sale of cattle.  Three were from Ozarks Regional in September 2018 in the amounts of $65,236.76, $578.88, and $53,920.27.[10]  One was from Stone Cattle Company LLC, in September 2018 in the amount of $6,000.00.  One was from Courtney Durham in October 2018 in the amount of

---

[9] An additional payment of $5.00 was applied to principal on May 3, 2018, but the back-up documentation did not reflect the source of this payment.  In addition, on June 18, 2018, there was a $50.00 interest payment reversal.

[10] The back-up information for the first two Ozarks Regional checks indicates that the total received from Ozarks Regional was $75,199.52.  The two checks identified by Mr. Grosdidier total $65,815.64, but the allocations to the Bullet Loan (Loan No. 2700) add up to $68,315.54.  It appears information was deleted from the copy of the exhibit introduced.  The reason for the discrepancies in these three numbers is not apparent from the record.  (Pl.'s Ex. 53).

25

$52,000.00, and one was from Jack Dalton in October 2018 in the amount of $114,000.00.  The

six checks totaled $291,735.91.  Mr. Grosdidier did not include the $42,000.00 check written on

Mr. Durham's Bank of Cave City account with the notation "calves" because he could not match

that dollar amount "one to one" to any of the dollar amounts from Ozarks Regional.  (Tr. at 165).

### (2) Alleged "Unaccounted for" Cattle Calculations

AgHeritage presented the testimony of Mr. Grosdidier to support its assertion that the

Durhams sold cattle and failed to remit the proceeds to AgHeritage.  He testified that

AgHeritage's records revealed there were "unaccounted for" cattle.

Mr. Grosdidier stated he was able to calculate decreases in the herd from the records and

exhibits for three time periods up to the date of the last inspection.  He made no adjustments in

his calculations for attrition or death within the herd because, according to his testimony, there

was "no evidence or information provided to be able to support that." (Tr. at 182).  The

following is a summary of Mr. Grosdidier's calculation of damages for the decrease in cattle:

### (a) First Time Period

Referring to the numbers on the February 2016 Balance Sheet and the May 2017

Balance Sheet, Mr. Grosdidier calculated decreases in cattle.  The February 2016 Balance Sheet

listed 312 larger calves, 350 smaller calves, and 450 momma cows for a total of 1,112 head of

cattle.[11]  The 2017 Balance Sheet listed 165 larger calves, 185 smaller calves, and 323 momma

cows for a total of 673 head of cattle.  He testified that the documents he was "able to obtain"

indicated that during this time frame Mr. Durham sold 158 larger calves.  (Tr. at 171).  He

acknowledged that some of the smaller calves on the February 2016 Balance Sheet would have

grown into the larger calves category by the May 2017 Balance Sheet date but testified that

---

[11] Mr. Grosdidier's calculations did not include bulls or horses.

"[j]ust from a numbers standpoint" there is a net "difference of seven calves" for the larger

calves category. (Tr. at 172). He did not have documentation for any other sales so he

subtracted beginning and ending numbers for the smaller calves and momma cows for the

following damages:

| | |
|---|---|
| 7 larger calves @ $1,000.00 each | $    7,000.00 |
| 165 smaller calves @ $650.00 each | $107,250.00 |
| 127 momma cows @ $1,500.00 each | $190,500.00 |
| Total: | $304,750.00 |

Based on these numbers, Mr. Grosdidier included 299 total calves and cows in his calculation of

damages for the reduction in the herd between the two balance sheet dates.

During the trial, AgHeritage was provided documentation for a $100,000.00 sale of cattle

to Rick Foster in March 2016. According to Mr. Grosdidier's testimony, the documentation

reflected the sale was for 112 calves. The testimony also confirmed that the $100,000.00

payment was applied to a grain loan on March 17, 2016, instead of to Mr. Durham's cattle loan.

Mr. Grosdidier then recalculated the damages amount to give "credit for the Foster sale." (Tr. at

178). He testified the recalculated damages amount was $231,950.00, a difference of $72,800.00

from the original amount. It appears to the Court that he accounted for the 112 calves sold to

Mr. Foster by reducing the smaller calves number from 165 to 53 and calculating damages based

on 53 "unaccounted for" smaller calves at a value of $650.00 each, resulting in a new calculation

of damages for this time period as follows:

| | |
|---|---|
| 7 larger calves @ $1,000.00 each | $    7,000.00 |
| 53 smaller calves @ $650.00 each | $  34,450.00 |
| 127 momma cows @ $1,500.00 each | $190,500.00 |
| Total: | $231,950.00 |

    (b) *Second Time Period*

Next, Mr. Grosdidier calculated damages for "unaccounted for" cattle from the May 2017 Balance Sheet to the July 2018 Inspection Report.  The May 2017 Balance Sheet, as stated above, listed 165 larger calves, 185 smaller calves, and 323 momma cows for a total of 673 head of cattle.  The July 2018 Inspection Report listed 160 larger calves, 106 smaller calves, and 319 momma cows for a total of 585 head of cattle.  During the same time frame, Mr. Grosdidier was aware of 136 calves being sold.  In addition, he recognized the theft of cows reported by Mr. Durham and made an allowance for 14 stolen calves.  Due to the number of calves present on the July 2018 Inspection report, he determined there were no unaccounted for calves, which he described as a "normal evolution from a sales standpoint."  (Tr. at 175).  He did calculate damages for 4 "unaccounted for" momma cows due to the reduction from 323 to 319 with no sales documented.  Based on the foregoing, the damages alleged for this timeframe were as follows:

        4 momma cows @ $1,100.00 each       $   4,400.00

    (c) *Third Time Period*

Mr. Grosdidier's final damages calculation for the reduction in cattle was for the period between the July 2018 Inspection Report and the October 2018 Inspection Report.  As stated above, the July 2018 Inspection Report reflected 160 larger calves, 106 smaller calves, and 319 momma cows for a total of 585 head of cattle.  The October 2018 Inspection Report reflected 71 total calves and 253 momma cows for a total of 324 head of cattle.  Mr. Grosdidier was aware of documentation supporting the sales of 165 calves.  He testified he also knew of a $6,000.00 sale to Stone Cattle but was unaware of the number of calves or cows sold to Stone Cattle.

As stated above, the notes to the October 2018 Inspection Report indicated that 20 of the momma cows listed on the July 2018 Inspection Report belonged to Mr. Durham's mother. Acknowledging this statement, Mr. Grosdidier testified that he "took them out" of the damages calculation. (Tr. at 176). In reviewing his calculation, it appears Mr. Grosdidier reduced the number of *calves* by 20, rather than the number of momma cows, resulting in a higher amount of damages. He calculated 10 "unaccounted for" calves by taking the July 2018 Inspection Report number of 266 total calves, subtracting the number of total calves remaining on the October 2018 Inspection Report of 71, subtracting the 20 cows owned by Mr. Durham's mother, and subtracting the number known to be sold of 165. He calculated 66 "unaccounted for" momma cows by taking the July 2018 Inspection Report number of 319 cows and subtracting the 253 cows remaining on the October 2018 Inspection Report. Based on these calculations, he alleged damages for this timeframe as follows:

| | |
|---|---|
| 10 calves @ $650.00 each | $  6,500.00 |
| 66 momma cows @ $850.00 each | $56,100.00 |
| Total: | $62,600.00 |

Based on Mr. Grosdidier's calculations and methodology, AgHeritage asserted damages of $298,950.00 for missing cattle.

### *(3) Alleged "Converted" Checks*

AgHeritage also argued that the Durhams converted certain check proceeds from the sale of cattle. As stated above, Mr. Grosdidier testified that he could locate only six checks that he could identify as being paid to AgHeritage from the sale of cattle. Again, three were from Ozarks Regional in the amounts of $65,236.76, $578.88, and $53,920.27. One was from Stone Cattle Company LLC, in the amount of $6,000.00. One was from Courtney Durham in the

amount of $52,000.00, and one was from Jack Dalton in the amount of $114,000.00. These checks totaled $291,735.91.

Mr. Grosdidier was asked by his counsel, "Other than those six checks, did you have sufficient information to be able to determine if any of the other livestock proceeds were directly applied to these AgHeritage loans?" (Tr. at 165). He replied, "Not from the checks and the payments to the AgHeritage loans themselves, no." (Tr. at 165). He then reviewed the sales documents from Ozarks Regional and Ash Flat Livestock and testified he was unable to determine whether the following checks were applied to the AgHeritage loans:

Ozarks Regional Checks:

| | |
|---|---|
| 01/17/2017 | $ 25,162.53 |
| 02/21/2017 | $ 15,022.85 |
| 02/28/2017 | $ 12,366.30 |
| 04/18/2017 | $ 73,813.21 |
| 10/24/2017 | $ 18,165.50 |
| 01/05/2018 | $ 67,341.01 |
| 03/06/2018 | $ 18,926.83 |
| 06/26/2018 | $ 13,652.11 |
| Total: | $244,450.34 |

Ash Flat Livestock Checks:

| | |
|---|---|
| 04/06/2018 | $ 1,293.73 |
| 05/25/2018 | $ 2,301.26 |
| Total | $ 3,594.99 |

Again, Mr. Grosdidier did not give credit for the $42,000.00 check written on Mr. Durham's Bank of Cave City account with the notation "calves" on the memo line because he could not match that dollar amount "one to one" to any of the dollar amounts from the sale barns. He also did not give credit for any checks that did not specifically reflect cattle on them. When asked by opposing counsel whether it was "possible that some of those checks could have

been cow proceeds that did not have enough documentation for [him] to credit them as such," Mr. Grosdidier responded, "I won't make that assumption." (Tr. at 190). Opposing counsel asked again, "You won't say it's possible?" (Tr. at 190). Mr. Grosdidier replied, "I will not make an assumption." (Tr. at 190). Based on Mr. Grosdidier's calculations and methodology, AgHeritage asserted damages of $248,045.33 for the alleged conversion of checks.

When added to the damages asserted for missing cattle, the total amount of damages sought by AgHeritage equals $546,995.33. In addition to the calculation of damages, Mr. Grosdidier testified that the current principal balance due on the Bullet Loan is $502,553.93 and interest due on the loan as of December 31, 2020, was $176,670.41. Interest has accrued and additional attorney fees have been incurred since that date.

### III. Arguments

AgHeritage argued the debt owed to it by the Durhams should be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), and (a)(6). AgHeritage also argued the Durhams' discharge should be denied pursuant to 11 U.S.C. § 727(a)(3).[12]

As it concerns Section 523(a)(2)(A) and (B), AgHeritage argued the February 2016 Balance Sheet listed cattle and equipment that either did not exist or was not owned by the Durhams. AgHeritage argued that it relied on the February 2016 Balance Sheet in restructuring the Durhams' debt, and that the Durhams intended to deceive AgHeritage about their actual financial condition.

---

[12] In its complaint, AgHeritage also included a count under Section 727(a)(2). At trial, however, AgHeritage did not argue the Durhams' discharge should be denied under Section 727(a)(2). The Court finds AgHeritage abandoned this claim at trial. *See Gulfcoast Workstation Corp. v. Peltz (In re Bridge Info. Sys., Inc.)*, 460 F.3d 1041, 1047 (8th Cir. 2006). Even more, the evidence revealed that 727(a)(2) would not apply to the facts of this case, as the acts AgHeritage complained of, namely the decrease in herd size and alleged "converted" checks, occurred more than one year before the bankruptcy filing. *See* 11 U.S.C. § 727(a)(2)(A)–(B) (denying a discharge where the debtor, "with intent to hinder, delay, or defraud a creditor . . . transferred, removed, destroyed, mutilated, or concealed" property within one year of the petition date or postpetition).

31

As it concerns Section 523(a)(6), AgHeritage argued that if the cattle numbers are not misrepresented on the February 2016 Balance Sheet, then the Durhams sold cattle and converted the proceeds to their own use, as evidenced by the "unaccounted for" cattle figures and the alleged "converted" checks from the sale barns. AgHeritage argued the Durhams' actions were both willful and malicious.

As it concerns Section 727(a)(3), AgHeritage argued the Durhams did not maintain adequate records from which their financial condition may be determined. It argued the Durhams' failure is grounds to deny their discharge.

Each cause of action is addressed separately below.

### IV. Discussion

#### A. Section 523(a)(2)

AgHeritage seeks relief under both Section 523(a)(2)(A) and Section 523(a)(2)(B) of the Bankruptcy Code. Section 523(a)(2) of the Bankruptcy Code provides that a debtor will not be discharged from debts:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's or an insider's financial condition*; [or]
> (B) use of a statement in writing--
> (i) that is materially false;
> (ii) *respecting the debtor's or an insider's financial condition*;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2)(A)–(B) (emphasis added). Subsections (A) and (B) are "expressly mutually exclusive" because subsection (A) excludes statements concerning the debtor's financial condition and subsection (B) involves statements respecting the debtor's financial

condition. *First Nat'l Bank of Olathe v. Pontow*, 111 F.3d 604, 608 (8th Cir. 1997) (quoting

*Barclays Am./Bus. Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 877 n.1 (8th Cir. 1985)).

As framed by AgHeritage, the issue before the Court involves statements made in the

February 2016 Balance Sheet concerning the number of cattle and equipment owned by the

Durhams.  These statements are made in a balance sheet given in connection with the Bullet

Loan.  The statements concern the Durhams' financial condition.  *See Webster City Prod. Credit*

*Ass'n v. Simpson (In re Simpson)*, 29 B.R. 202, 210 (Bankr. N.D. Iowa 1983) (finding a balance

sheet constitutes a statement concerning the debtor's financial condition).  Because these

statements concern the Durhams' financial condition, Section 523(a)(2)(A) is inapplicable.

Therefore, the relief sought by AgHeritage under Section 523(a)(2)(A) must be denied.

Under Section 523(a)(2)(B), AgHeritage bears the burden of proving the following five

elements:

> 1. the debtor made a written statement;
>
> 2. the statement was materially false;
>
> 3. the statement was in regard to the debtor's or an insider's financial condition;
>
> 4. the creditor reasonably relied on the statement; and
>
> 5. the debtor made the statement with an intent to deceive.

*Northland Nat'l Bank v. Lindsey (In re Lindsey)*, 443 B.R. 808, 813 (B.A.P. 8th Cir. 2011), *aff'd*,

431 F. App'x 521 (8th Cir. 2011).  AgHeritage must prove each element by a preponderance of

the evidence.  *Pontow*, 111 F.3d at 608 (citing *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991);

*Valley Nat'l Bank v. Bush (In re Bush)*, 696 F.2d 640, 644 n.4 (8th Cir. 1983)).  "This means the

trier of fact must believe the existence of a fact is more probable than its nonexistence."  *Lindsey*,

443 B.R. at 812 (citing *Buchholz v. Dewey (In re Dewey)*, 263 B.R. 258, 263 (Bankr. N.D. Iowa

2001)).  "Exceptions to discharge are narrowly construed to effectuate the 'fresh start' of the

Bankruptcy Code."  *First Neb. Bank v. Balfour (In re Balfour)*, No. 18-8337, 2020 WL 412184,

at *15 (Bankr. D. Neb. Jan. 24, 2020) (citing *Cmty. Fin. Grp., Inc. v. Fields (In re Fields)*, 510

B.R. 227, 233 (B.A.P. 8th Cir. 2014)).

Again, the statements at issue here regard the number of cattle and equipment owned by

the Durhams as listed in the February 2016 Balance Sheet.  As stated above, these statements

concern the Durhams' financial condition, meeting the third element.  The remaining elements

will be discussed below.

### *(1) Written Statement of the Debtors*

The first element AgHeritage must prove is that the Durhams made a written statement.

To meet this element, AgHeritage must prove they "wrote, signed, or adopted and used the

written statement."  *Bank Nw. v. Clevenger (In re Clevenger)*, No. 20-4019, 2020 WL 7753313,

at *4 (Bankr. W.D. Mo. Dec. 29, 2020) (citing *Cap. City Bank & Trust v. Kroh (In re Kroh)*, 88

B.R. 987, 994 (Bankr. W.D. Mo. 1988)).

The February 2016 Balance Sheet was signed by Mr. Durham, but it was not signed by

Dina Durham.  The evidence revealed that the numbers in the balance sheet came from the

February 2016 Inspection Report.  Mr. Brannon conducted the inspection with Mr. Durham

present, but there was no testimony that Dina Durham was present during the inspection or

provided any financial information to AgHeritage.  The testimony revealed that Dina Durham

did not participate in the cattle operation.

The Court finds the February 2016 Balance Sheet was a written statement of Mr.

Durham, but that AgHeritage failed to prove it was a written statement of Dina Durham.  *See*

*Balfour*, 2020 WL 412184, at *15 (creditor failed to meet burden on first element as to one

34

debtor who did not sign balance sheet, did not discuss balance sheet with bank representatives, and did not provide financial information to bank).

For the foregoing reasons, the Court finds that AgHeritage met its burden of proof on the first element as to Mr. Durham but failed to meet its burden as to Dina Durham.

### (2)  Materially False Statements

The second element AgHeritage must prove is that the statements were materially false. "A statement is false if it contains a misrepresentation or has major omissions." *Clevenger*, 2020 WL 7753313, at *5. To evaluate whether a statement is *materially* false, the Court must look at "objective and subjective components." *First State Bank of Munich v. Braathen (In re Braathen)*, 364 B.R. 688, 701 (Bankr. D.N.D. 2006) (citing *Ramsey Nat'l Bank & Trust Co. v. Dammen (In re Dammen)*, 167 B.R. 545, 550–51 (Bankr. D.N.D. 1994)). "Objectively, a statement is materially false if it paints a substantially untruthful picture of a debtor's financial condition by misrepresenting information of the type that would normally affect the decision to grant credit." *Braathen*, 364 B.R. at 701 (citing *Wallander v. Wallander (In re Wallander)*, 324 B.R. 746, 752 (Bankr. N.D. Iowa 2005)); *see also Lindsey*, 443 B.R. at 813. "The relevant subjective inquiry, although not dispositive, is whether the complaining creditor would have extended credit had it been apprised of the debtor's true situation." *Braathen*, 364 B.R. at 701 (citing *Dammen*, 167 B.R. at 551); *see also Agribank, FCB v. Webb (In re Webb)*, 256 B.R. 292, 296 (Bankr. E.D. Ark. 2000) ("[T]he statement is material if it substantially affects the decision to extend credit.").

AgHeritage argued the February 2016 Balance sheet contained materially false statements because it contained an inflated number of cattle and reflected equipment the Durhams did not own.

35

(a) *Cattle*

The February 2016 Balance Sheet reflected 312 larger calves, 350 smaller calves, 20 bulls, and 450 momma cows, for a total herd of 1,132 head of cattle. AgHeritage argued this number was inflated.

Calves. The Court finds that AgHeritage failed to prove the number of calves listed on the February 2016 Balance Sheet was false. The May 2017 Balance Sheet listed 165 larger calves and 185 smaller calves, a difference of 312 total calves from the February 2016 Balance Sheet. Sales records reflected the sales of 270 calves between these two balance sheet dates: 158 through Ozarks Regional and 112 to Rick Foster. Natural mortality rates among calves would account for another 41 to 82 calves.[13] The sales records and natural mortality rates account for all the calves between the two balance sheet dates, and therefore, the Court finds AgHeritage failed to prove the number of calves listed on the February 2016 Balance Sheet was false.[14]

Bulls. There was no argument or evidence at trial to support a finding that the number of bulls listed on the February 2016 Balance Sheet was false. The February 2016 Balance Sheet reflected 20 bulls, and the May 2017 Balance Sheet reflected 21 bulls. The Court finds AgHeritage failed to prove the number of bulls listed on the February 2016 Balance Sheet was false.

Momma cows. The Court finds AgHeritage did prove the number of momma cows listed on the February 2016 Balance Sheet was false. In fact, there was no dispute this cattle count was

---

[13] The evidence revealed that normal mortality rates in a herd are between 5% and 10% annually. The February 2016 Balance Sheet listed 662 total calves. A 5% mortality rate over the one-year-and-three-month period between the February 2016 Balance Sheet and May 2017 Balance Sheet results in the loss of approximately 41 calves. A 10% mortality rate over this same period results in the loss of approximately 82 calves.

[14] In conducting this analysis, the Court follows the parties' lead in looking at the cattle counts "just from a numbers standpoint." The Court is aware that momma cows continued to bear calves each year, and smaller calves grew into larger calves each year. The evidence before the Court did not account for this natural fluctuation in the cattle numbers.

36

inaccurate.  Mr. Durham testified that although he did not dispute the head count in the balance sheet at his November 2019 deposition, he disagreed with the count at the time of trial.  He testified that the land he used for his cattle operation would not support a herd numbering 1,132, but rather would support momma cows "somewhere in the 300 range," not 450.

The Court found the testimony of Mr. Durham credible.  The testimony revealed Mr. Durham was personally involved in his cattle operation, raising the cattle from birth and even naming some of them.  In addition, he was knowledgeable about the nature and quality of the land he used for the cattle operation and how many head of cattle it could support.  In addition, only 323 momma cows were listed in the May 2017 Balance Sheet.  Mr. Durham testified that he did not dispute the numbers in the May 2017 Balance Sheet, and the records do not reflect the sale of any momma cows between the February 2016 Balance Sheet and May 2017 Balance Sheet.  For these reasons, the Court finds the number of momma cows listed on the February 2016 Balance Sheet was false.

The next question is whether the false statement was material.  The Court must evaluate whether the statement was both objectively material and subjectively material.  To determine if the statement was objectively material, the Court is to decide whether the false statement "paint[ed] a substantially untruthful picture of [the Durhams'] financial condition by misrepresenting information of the type that would normally affect the decision to grant credit." *Braathen*, 364 B.R. at 701.

The momma cows were valued at $1,750.00 a head in the February 2016 Balance Sheet. There is insufficient evidence for the Court to determine the correct number of momma cows as of February 4, 2016, but the Court finds the number was "somewhere in the 300 range," as stated by Mr. Durham.  Reducing the number of momma cows from 450 to 300 would result in a

difference of $262,500.00 in assets listed on the balance sheet. Reducing the number from 450 to 399 would result in a difference of $89,250.00 in assets listed on the balance sheet. In the February 2016 Balance Sheet, Mr. Durham listed assets totaling $4,600,033.00 and equity totaling $1,029,472.00. Reducing the assets to reflect momma cows "in the 300 range" would constitute only a small reduction in total assets: somewhere between approximately 1.9% and 5.7%. However, the same reduction involves a larger percentage reduction in total equity: approximately 8.7% to 25.5%.

Overstatements of assets that are relatively small in comparison to overall assets or net worth have been found to be immaterial, while larger overstatements have been found to be material. *See Clevenger*, 2020 WL 7753313, at *6 (debtor's wrongful inclusion of asset worth less than 10% of the total equipment value and only 6.5% of total net worth did not paint a substantially untruthful picture); *Braathen*, 364 B.R. at 701 (overstating value of tools valued at 3% of total assets did not paint a substantially untruthful picture). *But see Simpson*, 29 B.R. at 210 (finding an overstatement of $30,000.00 material where it represented 20% of the loan amount).

Here, the reduction in assets is relatively small, but the effect it would have on the overall equity is more significant. However, the Court need not determine whether the inflated cattle number was objectively material because AgHeritage failed to present any evidence of whether the statement was subjectively material.

Under the subjective analysis, the Court is to determine "whether the complaining creditor would have extended credit had it been apprised of the debtor's true situation." *Braathen*, 364 B.R. at 701. AgHeritage did not present *any* evidence of whether the Bullet Loan would have been approved had it known the cattle count was inflated. The testimony did reveal

38

that it was not the Durhams who initially sought the Bullet Loan, but rather AgHeritage who approached them with the consolidation plan after refusing to continue to finance the Durhams' row crop operation. The Durhams had several existing loans with AgHeritage at the time, and they did not receive any new proceeds from the Bullet Loan. No testimony was given concerning the loan approval process involved with the Durhams' loan or the documents AgHeritage relied on in approving the Bullet Loan.

Indeed, AgHeritage did not introduce any evidence of whether the Bullet Loan would have been approved had it known of the inflated cattle count in the February 2016 Balance Sheet. Therefore, the Court finds that AgHeritage failed to prove the false statement was material.

For the foregoing reasons, the Court finds that AgHeritage failed to meet its burden of proving the cattle count in the February 2016 Balance Sheet was materially false.

### (b) *Equipment*

In its complaint, AgHeritage alleged the Durhams gave false financial information in balance sheets by including equipment the Durhams did not own. During the trial, AgHeritage presented evidence concerning the 9760 JD Combine. Mr. Grosdidier testified the 9760 JD Combine "was on the value assigned with the balance sheets." (Tr. at 156). Only two balance sheets were introduced: the February 2016 Balance Sheet and the May 2017 Balance Sheet. At trial, counsel for AgHeritage limited his Section 523(a)(2) argument to only the February 2016 Balance Sheet.[15]

---

[15] Counsel for AgHeritage made clear its argument under Section 523(a)(2) was based on the February 2016 timeframe. To the extent AgHeritage asserts the combine was included in the value of equipment listed in the May 2017 Balance Sheet, this argument is not supported by the evidence. Indeed, there is no itemized list of equipment in either the May 2017 Balance Sheet or corresponding May 2017 Inspection Report. In addition, while Mr. Grosdidier testified the 9760 JD Combine was listed on the insurance declaration page and depreciation schedules in the Durhams' tax returns, AgHeritage did not argue the statements in these documents gave rise to a claim under Section 523(a)(2).

AgHeritage failed to meet its burden of proving that the February 2016 Balance Sheet contained materially false statements regarding the 9760 JD Combine.  The February 2016 Balance Sheet listed machinery and equipment with a total value of $672,000.00.  No itemized list of machinery and equipment was attached to the balance sheet, but the February 2016 Inspection Report does contain an itemized list, and the testimony revealed that the numbers on the balance sheet came from the inspection report.  The 9760 JD Combine is *not* listed in the February 2016 Inspection Report.  Furthermore, the value of all machinery and equipment given in the February 2016 Inspection Report is $672,000.00, consistent with the number on the February 2016 Balance Sheet.  The value of equipment listed on the February 2016 Balance sheet, therefore, did not include the 9760 JD Combine.

The Court finds that AgHeritage failed to prove that the February 2016 Balance Sheet contained false statements regarding the 9760 JD Combine.

For all these reasons, the Court finds AgHeritage failed to meet its burden of proving the second element of materially false statements as to both the cattle count and value of equipment listed in the February 2016 Balance Sheet.

### (3) Reasonable Reliance

The next element AgHeritage must prove is that it reasonably relied on the statements. Under this element, AgHeritage must prove both that it actually relied on the false statements and that such reliance was reasonable under the circumstances.  *Borstad*, 550 B.R. at 837 (citing *Fleming Mfg. Co. v. Keogh (In re Keogh)*, 509 B.R. 915, 932 (Bankr. E.D. Mo. 2014)).  As to actual reliance, "[i]f the evidence shows the plaintiff relied on other factors—the debtor's substantial customer history with the bank, good credit history, tract record of paying debts, or

overall good relationship with the bank, for example—the plaintiff did not actually rely on the false statement." *Clevenger*, 2020 WL 7753313, at *6 (citing *Lindsey*, 443 B.R. at 815).

As to reasonableness, courts look to the "totality of the circumstances." *Clevenger*, 2020 WL 7753313, at *7 (quoting *Pontow*, 111 F.3d at 610). Considerations include, among other things, "whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations." *Pontow*, 111 F.3d at 610 (quoting *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir. 1993)).

The only false statement that has been proven is the number of momma cows listed on the February 2016 Balance Sheet. AgHeritage did not present *any* evidence that it actually relied on the number of momma cows listed in the February 2016 Balance Sheet in making the Bullet Loan. Neither Mr. Brannon nor Mr. Grosdidier testified about the information on which AgHeritage relied in making the loan. There was no testimony on who approved the loan: was it approved by Mr. Brannon as loan officer, a loan committee, members of the board, or some other person or group? No evidence was presented on this issue, much less evidence of the documentation, if any, on which the approving party or parties relied.

In fact, the only testimony at trial concerning reliance on the balance sheet was elicited from Mr. Durham. Mr. Durham was asked by counsel for AgHeritage, "And AgHeritage relied on [the February 2016 Balance Sheet], didn't it?" Mr. Durham responded, "Yes." (Tr. at 87). The Court does not believe Mr. Durham, a nonrepresentative of AgHeritage, is a proper witness to establish AgHeritage's reliance. Moreover, even if he were a proper witness, his testimony on this point is insufficient to prove reliance because the issue is not whether AgHeritage relied on

41

the balance sheet in its entirety, but whether it relied on the false statement regarding the number of momma cows contained in the balance sheet. *See Clevenger*, 2020 WL 7753313, at *6–7 (finding this element was not met where the bank reasonably relied on the balance sheet as a whole but did not rely on the false statement contained in the balance sheet). The record is completely devoid of any evidence of reliance on this statement.

Rather, as stated above, the testimony revealed that the Durhams and AgHeritage had an existing relationship. AgHeritage financed the Durhams' row crop and livestock operations for many years. At the time of the Bullet Loan, the Durhams had at least nine outstanding loans with AgHeritage. The testimony also revealed it was not the Durhams that sought to consolidate the debt but rather AgHeritage that approached them about the Bullet Loan. The testimony further revealed that Mr. Brannon and Mr. Durham had a good relationship. Mr. Brannon testified that he has known Mr. Durham all his life, and Mr. Durham repeatedly testified that he trusted Mr. Brannon. This evidence suggests that AgHeritage may have relied on things other than the statements in the February 2016 Balance Sheet in approving the loan.

In any event, the Court finds AgHeritage failed to prove it actually relied on the statements in the February 2016 Balance Sheet regarding the number of momma cows and value of equipment. Because there is no actual reliance, the Court need not determine whether the reliance was reasonable. *See Clevenger*, 2020 WL 7753313, at *6 ("[I]f there is no actual reliance, the plaintiff cannot satisfy this element."); *see also Lindsey*, 443 B.R. at 814.

For these reasons, the Court finds AgHeritage failed to meet it burden as to the element of reasonable reliance.

### (4) Intent to Deceive

The final element AgHeritage must prove is that the Durhams made the false statements with an intent to deceive. "Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *Lindsey*, 443 B.R. at 815 (quoting *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987)). Intent to deceive does not require the debtor to "have a 'malignant heart.'" *Webb*, 256 B.R. at 297 (quoting *Tex. Am. Bank, Tyler, N.A. v. Barron (In re Barron)*, 126 B.R. 255, 260 (Bankr. E.D. Tex. 1991)). "Rather, intent to deceive necessarily focuses upon the objective facts and circumstances." *Id.* (citing *Meyer v. Dygert (In re Dygert)*, No. 98-4363, 2000 WL 630833, at *9 (Bankr. D. Minn. May 11, 2000)).

"Knowledge of the falsity of the information or reckless disregard for the truth of the information satisfies the intent element of section 523(a)(2)(B), and mere unsupported assertions of honest intent do not overcome the natural inferences derived from the admitted facts." *Id.* (citing *Dygert*, 2000 WL 630833, at *9). "The focus is, then, on whether the debtor's actions 'appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor.'" *Lindsey*, 443 B.R. at 815 (alteration in original) (quoting *Van Horne*, 823 F.2d at 1288). "Factors to consider include the debtor's intelligence and experience in financial matters and whether there was a clear pattern of purposeful conduct." *Se. Neb. Coop. Corp. v. Schnuelle (In re Schnuelle)*, 441 B.R. 616, 624 (B.A.P. 8th Cir. 2011) (citing *Fairfax State Sav. Bank v. McCleary (In re McCleary)*, 284 B.R. 876, 888 (Bankr. N.D. Iowa 2002)).

First, as to Dina Durham, the Court finds AgHeritage failed to meet its burden of proving intent. The Court has already found AgHeritage failed to prove the February 2016 Balance Sheet was a written statement of Dina Durham. Even if it could be construed as her written statement,

AgHeritage failed to prove she made it with the intent to deceive. There was no evidence Dina Durham was familiar with the finances of the cattle operation or knew the correct cattle counts in February 2016. She did not sign the balance sheet, and there was no proof of actual or reckless intent to deceive.

As to Mr. Durham, the Court has found that Mr. Durham falsely stated he owned 450 momma cows in the February 2016 Balance Sheet. While AgHeritage failed to prove the statement was materially false and failed to prove it relied on the statement, the Court will evaluate whether AgHeritage proved Mr. Durham made the statement with intent to deceive.

The evidence revealed that the cattle count reflected on the February 2016 Balance Sheet came from the February 2016 Inspection Report. The inspection was conducted by Mr. Brannon with Mr. Durham present. Mr. Brannon prepared the inspection report and the numbers from his report were then rolled over to the balance sheet. Mr. Durham admitted he signed the balance sheet; he further testified he signed it "out of . . . trust of Alan [Brannon]." (Tr. at 77). The evidence revealed Mr. Durham and Mr. Brannon had a good relationship and a mutual trust and respect. Again, the evidence revealed that Mr. Durham did not seek the consolidation loan from AgHeritage; it was AgHeritage that approached Mr. Durham with the plan to restructure the debt.

The Court found Mr. Durham to be a credible witness; nothing in the record caused the Court to disbelieve his testimony. The record revealed he was experienced in farming and cattle operations, but there was no evidence that he was experienced in financial matters. Nor was there evidence of a "clear patten of purposeful conduct." *Schnuelle*, 441 B.R. at 624. To the contrary, the record revealed he cooperated at every stage with AgHeritage. While there may be *some* evidence of a disregard for the accuracy of the balance sheet, in reviewing the record as a

whole, the Court does not find that AgHeritage proved by a *preponderance* of the evidence that Mr. Durham acted with intent to deceive AgHeritage or a *reckless* disregard for the truth. *See Lindsey*, 443 B.R. at 815–16 (upholding lower court's finding of no intent where the debtor was credible; testified truthfully; and cooperated with the bank, even though there "was evidence in the record that may have permitted the bankruptcy court to find otherwise").

Given the specific facts and circumstances of this case and the evidence and testimony presented at trial, the Court is not convinced Mr. Durham acted with intent to deceive AgHeritage. For all these reasons, the Court finds AgHeritage failed to meet its burden on this element.

AgHeritage bore the burden of proving each element under Section 523(a)(2)(B) by a preponderance of the evidence. Because AgHeritage failed to meet its burden to prove the second, fourth, and fifth elements, AgHeritage's claim under Section 523(a)(2)(B) must be denied.

## B. Section 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). As explained by the Eighth Circuit, the plaintiff must prove the following three elements under Section 523(a)(6): "(1) the debtor caused an injury to the creditor; (2) the injury must have been willfully inflicted—that is, the debtor must have desired the injury or must have been substantially certain that his conduct would result in the injury; and (3) the debtor's action must have been malicious." *Luebbert v. Global Control Sys., Inc. (In re Luebbert)*, 987 F.3d 771, 778 (8th Cir. 2021) (citing *Blocker v. Patch (In re Patch)*, 526 F.3d 1176, 1180–81 (8th Cir.

2008)).  The plaintiff must prove each of these elements by a preponderance of the evidence.  *Id*. (citing *Patch*, 526 F.3d at 1180).

AgHeritage argued that if the cattle numbers are not misrepresented on the February 2016 Balance Sheet, then the Durhams sold cattle and converted the proceeds to their own use.  It argued the "unaccounted for" cattle figures and "converted" checks from the sale barns prove its claim under Section 523(a)(6).  As explained in Part A, above, the Court has already found the numbers in the February 2016 Balance Sheet were incorrect.  Instead of having 450 momma cows, there were only momma cows "somewhere in the 300 range" at that time.  Nevertheless, the Court will evaluate AgHeritage's argument under 523(a)(6).

### (1) Injury to AgHeritage

The first element AgHeritage must prove is that the Durhams caused an injury to AgHeritage.  "Courts considering the applicability of the § 523(a)(6) exception to discharge must 'first determine exactly what injury the debt is for, and then determine whether the debtor both willfully and maliciously caused that injury.'"  *Luebbert*, 987 F.3d at 780 (quoting *Patch*, 526 F.3d at 1181).  An injury under Section 523(a)(6) can be a "legal injury"; that is, one that involves the "invasion of the legal rights of another."  *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 852 (8th Cir. 1997), *aff'd sub nom*. *Kawaauhau v. Geiger*, 523 U.S. 57 (1998).

AgHeritage proved that the Durhams did not pay the Bullet Loan as required under the terms of their agreement.  A balance remains due and owing to AgHeritage.  The Court therefore finds the Durhams caused AgHeritage an injury in not paying the full amount of the Bullet Loan. *See First Midwest Bank-Deerfield Branches v. Beeler*, No. 08-4006, 2009 WL 363907, at *11 (Bankr. D.S.D. Feb. 10, 2009) (concluding debt was the bank's deficiency claim and injury giving rise to that debt was the bank not receiving payment in full on its claim); *see also*

46

*Luebbert*, 987 F.3d at 779 (breach of contract is a legal injury). *Cf. First Am. Bank v. Voorhees (In re Voorhees)*, No. 99-99044, 2000 WL 35798976, at * 6 (Bankr. S.D. Iowa Dec. 5, 2000) (finding no injury where, despite technical conversion of collateral, notes were paid in full).

In addition, AgHeritage also proved it held a security interest in the Durhams' livestock and the security agreement contained a provision prohibiting the sale or other disposition of collateral except as specifically authorized in writing by AgHeritage. It is undisputed Mr. Durham sold cattle after the initiation of the Bullet Loan. It is unclear whether AgHeritage authorized the sales in writing. No writings, other than the memoranda of understanding, were introduced showing AgHeritage consented to the sale of livestock, but the uncontroverted testimony reveals that both parties intended for Mr. Durham to sell livestock during the term of the loan. Both parties consistently testified that the purpose of the Bullet Loan was to give Mr. Durham time to sell collateral to pay down the debt owed to AgHeritage. Mr. Durham's selling of cattle may have been a technical violation of the terms of the security agreement; however, even if this can be construed as an injury to AgHeritage, AgHeritage must still prove the injury was willfully inflicted and the result of malice. *See One Am. Bank v. Jacobson (In re Jacobson)*, 532 B.R. 742, 747 (Bankr. N.D. Iowa 2015) (violation of security agreement was injury but creditor still had to prove injury was willful and malicious).

### (2) *Willful Injury*

"Evaluating willfulness requires an inquiry into the debtor's subjective intent to cause injury." *Luebbert*, 987 F.3d at 780. "'[W]illful,' standing alone, means intentional or deliberate." *Long*, 774 F.2d at 880 (citing *Castiglia v. Morgan (In re Morgan)*, 22 B.R. 38, 39 (Bankr. D. Neb. 1982); *Morales v. Tanner (In re Tanner)*, 31 B.R. 338, 339 (Bankr. S.D. Fla. 1983)). The creditor must prove "that the debtor desired to bring about the injury or was, in fact,

47

substantially certain that his conduct would result in the injury that occurred." *Luebbert*, 987 F.3d at 780 (quoting *Patch*, 526 F.3d at 1180–81). "[N]ondischargeability takes a deliberate or intentional injury, not merely . . . a deliberate or intentional act that leads to injury." *Kawaauhau*, 523 U.S. at 61.

"The willfulness requirement is met when the bankruptcy court finds facts showing that the debtor's conduct accompanying the breach of contract amounted to an intentional tort against the creditor." *Luebbert*, 987 F.3d at 782. "When a debtor impermissibly disposes of his own property subject to a security interest in favor of a creditor and fails to remit the sale proceeds to the creditor, the debtor may be liable for the tort of conversion." *Mercantile Bank of Ark. v. Speers (In re Speers)*, 244 B.R. 142, 145 (Bankr. E.D. Ark. 2000).

AgHeritage argued the Durhams willfully injured AgHeritage because they acted in violation of the security agreement. AgHeritage pointed to the "unaccounted for" cattle calculations and "converted" checks from the sale barns as evidence of the Durhams' sale of cattle without applying the proceeds to AgHeritage's debt. Each is discussed below.

### (a) *"Unaccounted for" Cattle*

AgHeritage argued there are "unaccounted for" or "missing" cattle; therefore, the Durhams must have sold these cattle and retained the proceeds for their personal use. AgHeritage's position is not supported by the record.

In support of its argument that there were "unaccounted for" cattle, AgHeritage offered the testimony of Mr. Grosdidier. Although it was clear from the testimony of Mr. Brannon and Mr. Durham that it was not possible to count every head of cattle during the inspections, Mr. Grosdidier testified that he was able to calculate unaccounted for decreases in the herd based on the inspection reports and records from the sale barns. For the period between the February 2016

Balance Sheet and May 2017 Balance Sheet, Mr. Grosdidier first calculated 299 "missing" cattle. When he was presented with evidence at trial of the $100,000.00 sale to Rick Foster of 112 calves in March 2016, which had not been included in his calculation, he recalculated the "missing" cattle number to 187. For the period between the May 2017 Balance Sheet and July 2018 Inspection Report he calculated 4 "missing" cattle. For the period between the July 2018 Inspection Report and October 2018 Inspection Report he calculated 76 "missing" cattle.

The Court finds Mr. Grosdidier's testimony flawed in several respects. First, as stated in Part A, above, the Court has already found the February 2016 Balance Sheet contained an inflated number of momma cows. Rather than 450 momma cows, Mr. Durham owned momma cows "somewhere in the 300 range" as of that date. Mr. Grosdidier's "unaccounted for" cattle calculation between the February 2016 Balance Sheet and the May 2017 Balance Sheet is inflated because it assumes 450 is the correct number.

Second, Mr. Grosdidier's calculations are flawed because he made no adjustments for attrition or death within the herd. Mr. Brannon and Mr. Durham agreed that the average loss would typically be between 5% and 10% annually for both cows and calves. Mr. Grosdidier admitted that these numbers were realistic. By not accounting for natural mortality within the herd, Mr. Grosdidier's calculations were greatly inflated. In fact, accounting for a 5% to 10% reduction over the two-year-and-eight-month period between February 2016 and October 2018 results in a natural decrease between 116 and 233 head of cattle.[16]

---

[16] The Court has already found that the February 2016 Balance Sheet listing 450 momma cows is incorrect; rather there were momma cows "somewhere in the 300 range" during this time. However, for purposes of this analysis and following Mr. Grosdidier's argument, applying a 5% to 10% mortality rate to the beginning balances for the time periods AgHeritage used to calculate unaccounted for cattle would result in the following potential losses:

- February 2016 Balance Sheet to May 2017 Balance Sheet: starting with 1,112 total head of cows/calves, results in a loss of approximately 70 to 139 head of cattle due to death.
- May 2017 Balance Sheet to July 2018 Inspection Report: starting with 673 total head of cows/calves, results in a loss of approximately 39 to 79 head of cattle due to death.

49

Third, some of Mr. Grosdidier's calculations are incorrect.  For example, for the period between the May 2017 Balance Sheet and July 2018 Inspection Report, Mr. Grosdidier testified he could account for the sale of only 136 calves.  It appears to the Court he obtained this information from the Ozarks Regional sale receipts, which reflect the sale of 136 head of cattle during this time frame.  He failed to account for the sales of cattle evidenced by the Ash Flat Livestock sales receipts, which reflect the sale of 5 additional calves during this time period.

As another example of incorrect calculations, for the period between the February 2016 Balance Sheet and May 2017 Balance Sheet, Mr. Grosdidier first testified there were 299 "unaccounted for" cattle.  The February 2016 Balance Sheet listed 1,112 total cows and calves and the May 2017 Balance Sheet listed 673 total cows and calves, a difference of 439 head of cattle.  Based on records from Ozarks Regional, Mr. Grosdidier could account for the sale of 158 larger calves.  Subtracting 158 cattle from the 439 difference results in 281 head of cattle being "unaccounted for" under Mr. Grosdidier's methodology, not 299 as he testified.  His mistake appears to be in the calculation for the reduction of larger calves.  He acknowledged that some of the smaller calves would have grown into larger calves during this time period, but he testified "[j]ust from a numbers standpoint" they started with 312 larger calves, had 165 that were still present, and sold 158, for a net difference of 7 larger calves.  This calculation results in 11 larger calves to the *positive*, not 7 to the negative.

Fourth, the Court finds Mr. Grosdidier's methodology flawed.  He testified that he looked at it "just from a numbers standpoint," but under his methodology, the numbers only favored AgHeritage; he gave no credit to the Durhams when the numbers went the other way as shown by the following examples:

- July 2018 Inspection Report to October 2018 Inspection Report: starting with 585 total head of cows/calves, results in a loss of approximately 7 to 15 head of cattle due to death.

- As stated above, the February 2016 Balance Sheet listed 312 larger calves and the May 2017 Balance Sheet listed 165 larger calves, a difference of 147 larger calves. Mr. Grosdidier testified that he could account for the sale of 158 larger calves. He gave no "credit" for these 11 additional cows.

- The May 2017 Balance Sheet listed 350 total calves and the July 2018 Inspection Report listed 266 total calves, a difference of 84 calves. Mr. Grosdidier testified he could account for 136 total calves being sold during this time. In addition, he recognized the theft of cattle reported by Mr. Durham and made an allowance for 14 additional stolen calves. Under his methodology, he is trying to account for the difference of 84 cattle, but the documents reflected sales/theft of at least 150 head of cattle. Rather than giving any kind of credit for this overage of cattle under his methodology, Mr. Grosdidier just determined there were no "unaccounted for" calves during this time period, which he dismissed as a "normal evolution from a sales standpoint." (Tr. at 175). The Court cannot find Mr. Grosdidier's testimony credible.

- In reviewing the evidence regarding the theft of cattle, Mr. Grosdidier only accounted for a net loss of 14 calves due to theft. The evidence revealed, however, that 28 *cows* and 28 *calves* were stolen, and only 14 *calves* were returned to Mr. Durham, so his net loss was 28 cows and 14 calves.[17]

---

[17] The Court finds Mr. Durham's testimony regarding the theft of cattle credible and supported by the documentary evidence. Mr. Durham testified that 28 cows, 28 calves, and 1 bull were stolen in the Spring of 2018 by Josh Reed. The incident report corroborates this testimony. According to the incident report, Mr. Reed sold 7 of the stolen cows and 21 of the stolen calves to Mr. Yaiser, 14 of which were ultimately returned to Mr. Durham. The incident report further reveals after that the sales to Mr. Yaiser, Mr. Reed attempted to sell several more stolen cows and a couple of calves to Mr. Foster. The timing of the attempted sale to Mr. Foster supports Mr. Durham's testimony that Mr. Reed stole more than the 28 head of cattle sold to Mr. Yaiser. The evidence supports Mr. Durham's testimony that he suffered a net loss of 28 cows and 14 calves due to theft.

Fifth, the bank records upon which Mr. Grosdidier relied raise questions in the Court's mind. For example, the May 2017 Inspection Report contains an inaccuracy regarding the number of smaller calves. In one column, it reflected 350 smaller calves, but in another column on the same row it reflected 185 smaller calves. Initially, Mr. Brannon testified that as of the May 2017 Inspection Report there were 350 smaller calves. When questioned by the Court, Mr. Brannon then changed his testimony to state that 185 was the correct number of smaller calves because 185 was the number that rolled over to the May 2017 Balance Sheet. No other explanation was given as to why 185 was the correct number of smaller calves.

As another example, Mr. Grosdidier first testified that 299 cattle were "missing" in comparing the February 2016 Balance Sheet with the May 2017 Balance Sheet. At trial, AgHeritage was provided a copy of a check evidencing a sale of cattle by Mr. Durham to Rick Foster for a total price of $100,000.00 in March 2016. According to Mr. Grosdidier's testimony, the check reflected that the sale was for 112 calves. This sale had not previously been credited by Mr. Grosdidier in his "unaccounted for" cattle calculation. For some unexplained reason, Mr. Durham's payment of $100,000.00 for the sale of the cattle to Mr. Foster had been applied by AgHeritage to a grain loan of Mr. Durham. There was no sufficient explanation for why the check was applied to a grain loan or why Mr. Grosdidier failed to account for these calves in his initial calculations.

Finally, the flaws in Mr. Grosdidier's testimony can be seen in the way he "accounted for" the 112 smaller calves at trial. When the check was brought to light at trial, Mr. Grosdidier testified that he reduced the number of "unaccounted for" smaller calves between the February 2016 Balance Sheet and May 2017 Balance Sheet by 112, which reduced the number of "unaccounted for" cattle from 299 to 187. Under his analysis, because the smaller calves were

valued at $650.00 each in the February 2016 Balance Sheet, he gave a credit of only $72,800.00 to Mr. Durham in his damages calculation, even though the check itself was for $100,000.00. Again, the Court cannot find Mr. Grosdidier's testimony credible.

For all the reasons stated above, the Court finds the testimony of Mr. Grosdidier concerning the "unaccounted for" cattle calculations unreliable and not credible. The testimony was based on flawed calculations, flawed methodology, and, in part, on inaccurate bank records. The Court finds that AgHeritage failed to prove there were "unaccounted for" cattle.

### (b)  _Alleged "Converted" Checks_

In support of its argument that the Durhams sold cattle and failed to remit the proceeds to AgHeritage, AgHeritage introduced copies of checks from various purchasers of cattle as well as the partial year-end account statements. Mr. Grosdidier testified that he could directly identify only six checks as constituting proceeds from the sale of cattle. Three were from Ozarks Regional in September 2018 the amounts of $65,236.76, $578.88, and $53,920.27. One was from Stone Cattle Company LLC, in September 2018 in the amount of $6,000.00. One was from Courtney Durham in October 2018 in the amount of $52,000.00, and one was from Jack Dalton in October 2018 in the amount of $114,000.00.

Mr. Grosdidier testified that he was unable to determine whether the following checks from Ozarks Regional and Ash Flat Livestock were applied to the AgHeritage loans:

Ozarks Regional Checks:

| | |
|---|---|
| 01/17/2017 | $ 25,162.53 |
| 02/21/2017 | $ 15,022.85 |
| 02/28/2017 | $ 12,366.30 |
| 04/18/2017 | $ 73,813.21 |
| 10/24/2017 | $ 18,165.50 |
| 01/05/2018 | $ 67,341.01 |
| 03/06/2018 | $ 18,926.83 |
| 06/26/2018 | $ 13,652.11 |
| Total: | $244,450.34 |

Ash Flat Livestock Checks:

| | |
|---|---|
| 04/06/2018 | $ 1,293.73 |
| 05/25/2018 | $ 2,301.26 |
| Total | $ 3,594.99 |

(the "**Alleged Converted Checks**").

Each of the Alleged Converted Checks was made payable to Mr. Durham and Bank of Cave City.  Mr. Durham testified that he deposited most all checks from the sale of cattle into his account at the Bank of Cave City.  He would then write a check from that account to AgHeritage. Occasionally, he would deliver checks directly to AgHeritage.

Mr. Grosdidier testified that he was unable to determine whether the Alleged Converted Checks were applied to the AgHeritage debt because the check amounts did not match "one to one" to payments made on the loans.  He further testified that he did not give credit for any checks that did not specifically reflect cattle on them.  Because he could not match loan payments "one to one" with the above check amounts, he testified that AgHeritage had been damaged in the total amount of $248,045.33.

The Court does not find Mr. Grosdidier's testimony persuasive.  First, stating that only six checks can be identified as proceeds from cattle sales and then labeling all other checks from

54

Ozarks Regional as being "converted" by Mr. Durham is overreaching, at best. For example, the evidence revealed that Mr. Durham wrote a check for $42,000.00 to AgHeritage with the word "calves" on the memo line, but this amount was not counted as proceeds from the sale of cattle by Mr. Grosdidier because he could not match the amount "one to one" with the amount of one of the Alleged Converted Checks.

Next, while payments may not match "one to one" with amounts on these checks, the amount and timing of some of the payments fail to support AgHeritage's theory of conversion of all checks without a perfect match. For example, on May 1, 2017, a payment was applied to the Bullet Loan in the amount of $73,588.41. This payment was made thirteen days after Mr. Durham sold cattle at Ozarks Regional and received net sale cattle proceeds of $73,813.21. Although Mr. Grosdidier testified that AgHeritage maintained source documents for all payments made on the loans, AgHeritage did not introduce documentation showing the source of the May 1, 2017 payment.

In addition, the total amount of the Alleged Converted Checks is $248,045.33. Again, despite Mr. Grosdidier's testimony that all the payments made on the loans were supported by some documentation that would reflect the source of the funds, the Court finds that the source of over $425,000.00[18] in payments cannot be ascertained from the record. In other words, the partial year-end statements show that over $425,000.00 in payments were applied to the loans, but AgHeritage did not include backup information showing the source of these payments in the exhibits.

---

[18] The 2017 year-end statement did not include sources for $11,343.63 in payments made on Loan No. 5500; $20,246.07 in payments made on Loan No. 9900; $261,162.05 in payments made on Loan No. 2900; and $133,046.06 in payments made on the Bullet Loan. In addition, the evidence revealed that balances existed on all four loans at the end of 2017, but, despite testimony that all transactions for the loans should appear on the year-end statements, only the Bullet Loan was included on the 2018, 2019, and 2020 year-end statements. The Court has insufficient evidence to determine when the other three loans were paid off and what funds were used to pay them off.

Mr. Grosdidier was asked by opposing counsel whether it was possible some of these loan payments could have been proceeds from the sale of cattle. He responded that he would not "make that assumption." (Tr. at 190). He was asked again, "You won't say it's possible?" (Tr. at 190). He again replied, "I will not make an assumption." (Tr. at 190). The Court cannot find Mr. Grosdidier's testimony concerning the Alleged Converted Checks credible. While payments on the loans may not have matched "one to one," the evidence presented is insufficient to prove the Durhams failed to apply the proceeds to the AgHeritage debt.

Given the evidence presented, the Court finds that AgHeritage failed to show the Durhams converted the proceeds from the Alleged Converted Checks. There was simply not enough evidence introduced from which the Court can make this determination and there were too many flaws in Mr. Grosdidier's analysis for the Court to find it credible. No bank statements or other documents were introduced showing the proceeds from the Alleged Converted Checks were used for the Durhams' benefit. This, in addition to there being over $425,000.00 in payments made on the loans, with no documentation as to the source of the payments, leads the Court to its conclusion that AgHeritage failed to prove by a preponderance of the evidence that the Durhams sold cattle and retained the proceeds for their own use.

AgHeritage failed to prove there were "unaccounted for" cattle or that the proceeds from the Alleged Converted Checks were converted by the Durhams. These were AgHeritage's only arguments that the injury was willfully inflicted. The Court finds AgHeritage failed to prove the Durhams acted willfully.

### (3) Malicious Action

Even if the Court had found willful injury, AgHeritage must also prove the Durhams acted with malice. "Malice requires 'conduct targeted at the creditor at lease in the sense that the

conduct is certain or almost certain to cause harm.'" *Luebbert*, 987 F.3d at 780 (quoting *Waugh v. Eldridge (In re Waugh)*, 95 F.3d 706, 711 (8th Cir. 1996)).  The conduct must be "more culpable than that which is in reckless disregard of creditors' economic interests and expectancies." *Long*, 774 F.2d at 881.  The debtor's "knowledge that legal rights are being violated is insufficient to establish malice"; there must be "some additional aggravated circumstances." *Id*.  "A robust collection of bankruptcy court and circuit court authority suggests that the point of the malice inquiry is to determine whether the debtor's conduct was 'aggravated' or 'socially reprehensible' such that an imputation of malice is justified." *Luebbert*, 987 F.3d at 780 (citing *Bundy Am. Corp. v. Blankfort (In re Blankfort)*, 217 B.R. 138, 143–44 (Bankr. S.D.N.Y. 1998); *Rescuecom Corp. v. Khafaga (In re Khafaga)*, 419 B.R. 539, 550 (Bankr. E.D.N.Y. 2009)).

Even where conversion is proven, the case law is clear that conversion alone is not enough to prevent a debt from being discharged. *Long*, 774 F.2d at 879 (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934)).  "[A]n intentional tort such as conversion does satisfy the 'willful injury' component of (a)(6)," but malice must also be proven. *Outlander Gravel v. Nietert (In re Nietert)*, 521 B.R. 882, 891 (Bankr. W.D. Ark. 2013) (citing *Osborne v. Stage (In re Stage)*, 321 B.R. 486, 492–93 (B.A.P. 8th Cir. 2005)).

The Court does not find the Durhams acted with malice.  The evidence revealed that Mr. Durham had a good relationship with Alan Brannon and trusted Mr. Brannon.  He cooperated with AgHeritage throughout the entire Bullet Loan process.  He agreed to sell real estate, and he found buyers for the various tracts of property.  He was cooperative with DeWitt Auction and the sale of his equipment.

As it concerns the cattle, the evidence revealed that with the initiation of the Bullet Loan, AgHeritage granted Mr. Durham an operating loan for only one year. From May 1, 2017 forward, Mr. Durham fed and cared for the cattle—AgHeritage's collateral—out of his own pocket until they were all sold. He worked an outside job in order to do so.

In addition, during this workout process, Mr. Durham gave AgHeritage two additional tracts of land that had not previously been pledged as collateral. He testified he did this to show his "good faith" intentions to pay the debt and that he received nothing in return. Both tracts were sold and applied to the AgHeritage debt.[19]

The Court found the Durhams to be credible witnesses. Mr. Durham's actions show good faith and an honest intention to pay AgHeritage and care for its collateral. The fact that Mr. Durham worked an outside job in order to feed and care for the cattle is remarkable, as is his uncontroverted testimony that he gave AgHeritage two additional pieces of collateral in a good faith attempt to pay the debt. Given these facts, there can be no finding of malice.

For these reasons, the Court finds that AgHeritage failed to prove the Durhams acted with malice.

AgHeritage has failed to meet its burden of proof under Section 523(a)(6) and its claim must be denied.

### C. Section 727(a)(3)

AgHeritage's final claim against the Durhams is the objection to discharge under Section 727(a)(3) of the Bankruptcy Code. Because denying a debtor's discharge is a "harsh remedy, the

---

[19] One tract of land was completely unencumbered. Mr. Durham testified he gave AgHeritage the deed to that piece of property, and the property sold for $180,000.00, which was paid to AgHeritage. The second tract of land contained 160 acres. Mr. Durham was buying this second tract on an owner-financed contract and had paid about half the contract price. AgHeritage advanced enough money for the land sale contract to be paid in full, and Mr. Durham gave the entire 160-acre tract of land to AgHeritage to sell and apply to his debt.

provisions of § 727(a) 'are strictly construed in favor of the debtor.'" *Snyder v. Dykes (In re Dykes)*, 954 F.3d 1157, 1162 (8th Cir. 2020) (quoting *Korte v. I.R.S. (In re Korte)*, 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001)).

"To prevail under § 727(a)(3), a party seeking the denial of the debtor's discharge must establish that a debtor has 'concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the Debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case . . . ." *McDermott v. Swanson (In re Swanson)*, 476 B.R. 236, 240 (B.A.P. 8th Cir. 2012) (quoting *Korte*, 262 B.R. at 471).

Under Section 727(a)(3), "debtors have an affirmative duty to create records accurately documenting their financial affairs." *Southern Bancorp S. v. Richmond (In re Richmond)*, 430 B.R. 846, 871 (Bankr. E.D. Ark. 2010) (citing *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir. 1999)). The records "must 'enable the creditors to learn what [the debtor] did with his estate.'" *Richmond*, 430 B.R. at 871 (quoting *First State Bank of Newport v. Beshears (In re Beshears)*, 196 B.R. 468, 474 (Bankr. E.D. Ark. 1996)).

"To present a prima facie case under § 727(a)(3), the objecting party . . . must show '(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions.'" *Dykes*, 954 F.3d at 1163 (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d Cir. 1992)). "The test is 'whether there is available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained.'" *Dykes*, 954 F.3d at 1163 (quoting *Meridian Bank*, 958 F.2d at 1230). "The debtor is required to take such steps as ordinary fair dealing and common caution

dictate to enable the creditors to learn what he did with his estate." *Dykes*, 954 F.3d at 1163 (quoting *Davis v. Wolfe (In re Wolfe)*, 232 B.R. 741, 745 (B.A.P. 8th Cir. 1999)).

"Once [the objecting] party has shown that the debtor's records are inadequate, the burden of production shifts to the debtor to offer a justification for his record keeping (or lack thereof); however, the objecting party bears the ultimate burden of proof with respect to all elements of this claim." *Swanson*, 476 B.R. at 240 (citing *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 887 (7th Cir. 1983)).  The debtor's "burden to show that his record keeping was reasonable under the circumstances is triggered only after the party seeking to deny his discharge establishes that inadequate records exist." *Id.*

In determining whether the debtor's record keeping was justified, courts look at "all of the circumstances of the case," including factors such as "the education, experience, and sophistication of the debtor; the volume and complexity of the transactions; and 'any other circumstances that should be considered in the interest of justice.'" *Dykes*, 954 F.3d at 1163 (quoting *Meridian Bank*, 958 F.2d at 1231).

"Section 727(a)(3) embodies an objective standard of reasonableness; it does not require proof of intent." *Dykes*, 954 F.3d at 1163 (citing *Wolfe*, 232 B.R. at 745).

The Court finds AgHeritage failed to meet its burden under Section 727(a)(3).  First, as to Dina Durham, the evidence revealed she had nothing to do with the cattle operation.  No evidence was presented that she was involved with the business or was responsible for keeping any records for the business.  The Court finds that AgHeritage failed to prove Dina Durham's discharge should be denied pursuant to Section 727(a)(3).  *See Richmond*, 430 B.R. at 871–72 (finding wife did not have anything to do with business of husband and therefore she was not liable to lose her discharge under Section 727(a)(3)).

60

As to Mr. Durham, the Court finds Mr. Durham maintained adequate records. The evidence revealed that Mr. Durham has farmed and maintained cattle almost all his life. While he was knowledgeable in agriculture, there was no testimony that he was educated or sophisticated in financial matters. Mr. Durham testified that he kept records of his herd in a notebook and that he or his hired hand would give this information to Mr. Brannon during the inspections. Mr. Brannon likewise testified that during the inspections he would use the numbers provided by Mr. Durham or his hired hand. These records were handwritten and documented the number, type, and location of cattle in the herd. Two examples of these records were introduced into evidence. They reflected the typical records kept by not only Mr. Durham, but of his family who owned cattle as well.

The evidence further revealed Mr. Durham conducted his cattle business out of his account with the Bank of Cave City. He testified that he deposited most all checks from the sale of cattle into the Bank of Cave City account. He would then write a check from that account to AgHeritage. Occasionally, he would deliver checks directly to AgHeritage. He testified he did this for tax purposes; he would give these records, as well as the year-end statements from AgHeritage, to his accountant who would prepare and file the Durhams' tax returns. The 2016, 2017, and 2018 tax returns were introduced into evidence. The tax returns contain asset detail reports, listing all the Durhams' assets including cattle.

In addition, the evidence revealed that Mr. Durham maintained written records of the theft of cattle. He filed an incident report with the Lawrence County Sheriff's Office detailing the theft and he also maintained records of his claim for restitution. The Court finds this information accurate and supported by other evidence in the record.

Furthermore, Mr. Durham testified that he typically sold cattle to one of three buyers: Ozarks Regional, Ash Flat Livestock, or Rick Foster.  Mr. Durham's exhibits at trial included sales receipts from Ozarks Regional, and he also produced a copy of Mr. Foster's check evidencing the sale of 112 calves for $100,000.00.

Based on the foregoing, the Court finds AgHeritage failed to establish a prima facie case of inadequate record keeping under the circumstances of this case, and therefore the burden of production never shifted to Mr. Durham to show his record keeping was justified.

Even if the burden of production had shifted, however, the Court finds Mr. Durham satisfied his burden.  Mr. Durham's record keeping was reasonable, again viewing all the circumstances of this case.  His handwritten records established the number, type, and location of his cattle.  He and Mr. Brannon used these records during the various inspections.  He conducted his business through his account at the Bank of Cave City and provided this and other information to his accountant who prepared and filed his tax returns.  He maintained records regarding the theft of his cattle.  He typically sold his cattle either to sale barns or to Rick Foster, and the evidence revealed he maintained copies of those sales records.  In light of the nature of Mr. Durham's occupation and no evidence in the record that he was sophisticated in financial matters, the Court finds his record-keeping was sufficient.

Even when the burden of production shifts to the debtor, the ultimate burden of proof remains with the objecting party.  Considering all the facts and circumstances introduced into evidence, the Court finds AgHeritage failed to prove the Durhams did not maintain accurate records of their financial affairs.  AgHeritage's claim under Section 727(a)(3) is denied.

## V.  Conclusion

For the reasons stated herein, the Court finds that AgHeritage failed to establish that the debt owed to it by the Durhams should be declared nondischargeable or that the Durhams' discharge should be denied.  AgHeritage's claims under Sections 523(a)(2)(A), (a)(2)(B), (a)(6), and 727(a)(2) and (a)(3) are DENIED.  Judgment will be entered in favor of the Defendants, William Sloan Durham and Dina Gail Durham.

**IT IS SO ORDERED.**

Phyllis M. Jones
United States Bankruptcy Judge
Dated:  03/29/2022

cc:     Mr. Ralph W. Waddell
        Mr. G. Mike DeLoache
        Mr. Hamilton M. Mitchell
        Debtors